## STATE v. ROGOWAY.

[78 Pac. 987, 81 Pac. 234.]

ADMISSIBILITY OF CONFESSIONS — PRACTICE.

1. The determination of the court on a criminal trial that a confession of defendant was obtained from him without the influence of hope or fear exercised

by a third person, will not be disturbed on review unless there is clear and manifest error.

ARSON — CORPUS DELICTI — CORROBORATION OF CONFESSION.

2. On a prosecution for arson, where the building described in the indictment is conceded to have been burned, and there is some evidence that it was of incendiary origin, the *corpus delicti* is sufficiently shown to render defendant's confession admissible.

LIMITING ARGUMENT OF COUNSEL — CONSTITUTIONAL RIGHT TO TIME FOR FULL PRESENTATION OF CASE.*

3. The right to a full hearing of his case by counsel being secured to every defendant by Section 11 of the Oregon Bill of Rights and the Sixth Amendment to the Constitution of the United States, the trial court cannot arbitrarily limit the time for argument in a criminal case to a period within which no fair or comprehensive review of the evidence can be given — though it is the right of the trial judge to exercise such a supervision over the argument as will prevent an abuse of the right guaranteed.

EXAMPLE OF ABUSE OF DISCRETION IN LIMITING ARGUMENT.

4. When a criminal trial has required three days, during which twenty witnesses were examined and fifty exhibits were introduced, the evidence being circumstantial and conflicting, it is reversible error to limit defendant's counsel to only one hour in argument.

From Linn : GEORGE H. BURNETT, Judge.

Oscar Rogoway was convicted of arson and appealed.

REVERSED.

For appellant there was a brief over the names of *Hewitt & Sox*, and *J. J. Whitney*, with an oral argument by *Mr. Henry H. Hewitt*, and *Mr. Whitney*.

For the State there was a brief over the names of *John H. McNary*, District Attorney, *Gale S. Hill*, and *Chas. L. McNary*, with an oral argument by *Mr. Andrew M. Crawford*, Attorney General, and *Mr. C. L. McNary*.

MR. JUSTICE BEAN delivered the opinion of the court.

The defendant was convicted of the crime of arson by burning a building in the town of Lebanon occupied in part by his mother as a storeroom. From a judgment sentencing him to the penitentiary, he appeals. The fire occurred on Sunday night or Monday morning, about twelve or one o'clock. The building destroyed was a two-

NOTE.— See extended note in 46 Am. St. Rep. 23, Limitations Upon Argument of Counsel. REPORTER.

story structure. There were three main rooms on the first floor, two of which were occupied by Jennings Bros. for saloon purposes, and the other by defendant's mother as a dry goods store. Back of the saloon was a small cardroom used by the Jennings Bros. in connection with their saloon, separated by a wooden partition from that part of the building occupied by defendant's mother as a storeroom. Back of the storeroom, and adjoining the cardroom, was a small room occupied by the defendant and his brother-in-law as a sleeping room and for storing boxes and the like. Defendant's mother had been in business about six weeks at the time of the fire. She did not reside at Lebanon, but the store had been in charge of a son-in-law of hers by the name of Gross. The stock of goods consisted, according to the testimony of the State, principally of shopworn and secondhand articles, that at the time of the fire were not worth to exceed $200, while it was insured for $500, and a previous policy for $600 had been canceled by the insurance company. About three weeks before the fire the defendant came from San Francisco to Lebanon to assist Gross in the store. After his arrival it was their usual practice, as it had been Gross' before, to drive over to Albany after the week's business was over on Saturday night, and remain until Monday morning. On the day before the fire, however, for some reason unexplained, Gross went to Albany as usual, but the defendant remained in Lebanon. During Sunday he was back and forth between the place of business of a Mr. Turner, near by, and his mother's store, and Turner says he noticed he was "a little fidgety." He was last seen in Turner's store some time between nine and eleven o'clock Sunday night. About twelve o'clock, or a little after, he rushed out into the street, partly dressed, and gave the alarm of fire. The evidence of parties who were early at the fire tends to show that it

originated in that part of the building occupied by defendant's mother, and in the room occupied by him as a sleeping room. The defendant assisted in the endeavor to extinguish the fire as long as his services were of any use, and then engaged a room at a hotel and went to bed.

About four or five o'clock in the morning he was aroused from his sleep, as he testifies, by two persons, one of whom he recognized as a "twenty-one" dealer at Jennings Bros. saloon, and told that he was wanted at the telephone office. He immediately got up, dressed, and went to the office, but it was locked. As to what occurred afterward and the circumstances surrounding the alleged confession are thus detailed by the parties present: Andy Jennings says that, about four or five o'clock on the morning after the fire, "Me and my brother was standing in front of the St. Charles Hotel. We was standing there talking, wondering what we would do in the morning; watching our goods. We were standing there talking, and I looked down and see Rogoway come out of the door of the St. Charles, and I said, 'There goes that Rogoway now.' He went down toward the 'phone office. My brother said, 'I believe I'll go down and see where he is going,' I said, 'Yes.' At that time I was on crutches. I could not walk as fast as he could. By the time I got down, Rogoway was coming out of the 'phone office door. My brother met him. I don't know what was said. My brother got there before I did. * * Just at that time Mr. Irwin—and I would not be sure whether Mr. Irwin and Elkins came together, they came down the street, and my brother said, 'Rogoway, come walk down the street. I would like to talk to you.' He said, 'All right, boys.' My brother turns around to the other boys and said, 'Boys, come walk down with us.' We all struck out down the street, starting from the 'phone office. * * Down to Lamberson's corner. * * My brother done the talking to him. He says, 'Mr. Rogoway, what do

you know about the fire?' He says, 'Boys, I don't know anything about it.' My brother says to him, 'You needn't talk that way. I know better. We are satisfied that you know all about it, and every one in town does, and you might just as well go ahead and tell what you know about this.' He stood there quite a bit with his head down. My brother kept on talking in that manner. Pretty soon he said, 'Boys, I did do that.'"

Mr. Irwin says that about four or five o'clock in the morning after the fire he was standing in front of the St. Charles Hotel, and that he saw the defendant coming down the street; that Mr. Andy Jennings came along about that time, and Mr. Luke Jennings was there, and Andy said, "'Better go down and see what he has to say,' so we went down. Luke was standing there in front of the telephone office, and Andy and Mr. Elkins;" and that Luke Jennings asked him to step down from the door, and he refused to come at first, but then walked down, and "Jennings asked us to come along and hear what was said." He says that no conversation was held while going from the telephone office to Lamberson's corner. Jennings asked Rogoway what he knew about the fire, and he said that he did not know anything; and Jennings told him that he and everybody in town knew that he burned the store, and Rogoway finally said, "Well, I burned it." "We asked him if he used oil, and he said he didn't; he used paper. Asked him why he burned it. He said, 'For Mr. Gross.' Asked him what he burned it for. He said, 'For the insurance.' Asked him what he got out of it. He said he didn't know." Elkins says that about four or five o'clock in the morning he, in company with a man by the name of Lutz, started to go home, and just then he saw Rogoway go by; that Irwin was there, and he said, " Let's go down and see where he is going"; that when he and the others came there, Luke Jennings says to the defendant,

"Come down here. I want to see you"; and Andy says,
"Let's go down, boys, and see what he has to say"; that
after they got around Lamberson's corner, Luke says,
"'Tell us what you know about this fire,' and he kind of
hung his head. He says, 'Tell us what you know about
this fire.' He said he didn't know anything. He said,
'We know you do, and everybody else does. You might
just as well say you did this. We know it.' He hung his
head a bit, and after a little he said he did it." He also
says that Jennings then asked him if he would tell the
same story to the recorder, and he said that he would;
that the defendant was then taken to the recorder's office,
where he made the same statement in the presence of
the recorder and city marshal, and was by the recorder
committed to jail.

1. Each of these witnesses testifies that there was no
force or threats used to extort the statement or confession
from the defendant, and no inducement was held out, but
that it was a voluntary act on his part. There is testi-
mony, not necessary to particularize, on behalf of the de-
fendant, tending to show that the confession was extorted
from him in pursuance of a previously conceived plan of
the Jennings brothers, Irwin and Elkins, and perhaps
other parties; but the effect of this testimony, so far as
the competency of the confession is concerned, was to con-
tradict the evidence of the State tending to show that such
confession was a voluntary act, and was therefore for the
consideration of the trial court, in determining whether
such confessions should be admitted in evidence. It is
the settled law in this State that when, upon the trial of
a criminal cause, a confession of the defendant is offered
in evidence, it becomes necessary for the trial court to
ascertain and determine, preliminary to its admission,
whether the confession is competent, and was obtained
from the defendant free from the influence of hope or

fear exercised by a third person over the prisoner's mind :
*State* v. *Moran*, 15 Or. 262 (14 Pac. 419). This is an in-
quiry addressed to the court, and its determination thereof
will not be disturbed on an appeal unless there is clear
and manifest error. "Whether the confession of the
prisoner was voluntary or not," says the Supreme Court
of New Hampshire in *State* v. *Squires*, 48 N. H. 364, erro-
neously cited as 48 Cal. in the Moran Case, "is purely a
question of fact— as much so as the question whether a
witness offered to testify was interested or not, or whether
a witness was qualified to testify as an expert, or whether
the loss of a paper has been shown, so as to allow the in-
troduction of secondary evidence of its contents. In this
and the like cases the judge who tries the cause must de-
cide, although in some instances he may submit the ques-
tion of fact to the jury. In either case, whether the de-
cision be by the judge alone, or it be also passed upon by
the jury, no exception lies, so far as the question is one of
fact." And again, in *Fife* v. *Commonwealth*, 29 Pa. 429,
437, Mr. Chief Justice LEWIS says : "But the principle is
well settled that where the admissibility of evidence de-
pends upon a preliminary question of fact, to be tried by
the court, its decision is not to be reversed unless in a
case of clear and manifest error. The court that sees and
hears the witnesses must be presumed to have better
means of judging on a question of fact, than the appellate
tribunal, where the witnesses are neither seen nor heard,
and where it often happens that their testimony is very
imperfectly reported." Now, in this case the evidence for
the State tended to show that the alleged confession of the
defendant was voluntarily made ; and, while this evidence
is controverted and contradicted, there is not sufficient in
the record to justify this court in saying that the trial
court erred in holding that the confession was competent
and admissible as testimony. The admissibility of the testi-

mony was for the court, and its credibility and weight were for the jury, and were properly submitted to them.

2. It is also argued that there was no sufficient proof of the *corpus delicti* to entitle such confession to admission in evidence. "The *corpus delicti* is made up, * * " says Mr. Best, "of .two things : *First*, certain facts forming its basis ; and, *secondly*, the existence of criminal agency as the cause of them": Best, Evidence (ed. 1883), § 442. See, also, 7 Am. & Eng. Enc. Law (2 ed.), 861 ; 6 Am. & Eng. Enc. Law (2 ed.), 582, "Confessions," and numerous cases cited in the notes. Where the fact forming the basis of the *corpus delicti* is proven or admitted, the criminal agency may be shown by circumstantial evidence ; and in this connection a distinction is to be made between the evidence which would justify a conviction, and that degree of proof of criminal agency necessary to let in evidence of the confessions or admissions of the defendant. To justify a conviction, of course, the jury must be satisfied of the defendant's guilt beyond a reasonable doubt, and of every fact necessary to constitute the offense ; but it is not necessary, after the fact forming the basis of the *corpus delicti* is shown, that the evidence of the criminal agency should be of that conclusive character, in order to justify the admission of defendant's confession. Mr. Justice CLIFFORD, in *United States* v. *Williams*, 1 Cliff. 5 (Fed. Cas. No. 16707), speaking to this question, and commenting on the language used in Greenleaf's Evidence, said : "Considering the language employed by that author, it is somewhat doubtful how far he would carry the doctrine ; and, if it is to the extent that the *corpus delicti* must be fully proved independently of the confession, we are not prepared to adopt it, as in that view the admission of the confession would be useless, except to prove the agency of the accused, and would operate as an exclusion of the confession for any other purpose, whereas,

if freely and voluntarily made, it is clearly admissible as
evidence in support of any element in the charge to which
it applies.   Full proof of the body of the crime — the *corpus
delicti* — independently of the confession is not required,
says NELSON, C. J., in *People* v. *Badgley*, 16 Wend. 59, by
any of the cases, and in many of them slight corroborating
facts were held sufficient."   Mr. Justice PAXSON, in *Gray*
v. *Commonwealth*, 101 Pa. 380 (47 Am. Rep. 733), says:
" The true rule in such cases is believed to be this:
When the commonwealth has given sufficient evidence of
the *corpus delicti* to entitle the case to go to the jury, it is
competent to show a confession made by the prisoner,
connecting him with the crime."   *Sam* v. *State*, 33 Miss.
347, was a prosecution for arson, and the objection was
made that the *corpus delicti* was not sufficiently proven to
warrant an admission of the confessions of the prisoner.
The court said: " The main fact necessary to be estab-
lished as the basis of the prosecution was that the house
had been burned, for without that there could be no guilt
in any one.   After proof of that fact, it was necessary to
prove how it was done, and by whom ; and these particu-
lars could be established by any evidence which was com-
petent in law, and sufficient in its force to satisfy the mind.
The rule with regard to proof of the *corpus delicti*, apart
from the mere confessions of the accused, proceeds upon
the reason that the general fact, without which there could
be no guilt either in the accused or in any one else, must
be established before any one could be convicted of the
perpetration of the alleged criminal act which caused it,
as in cases of homicide the death must be shown, in lar-
ceny it must be proved that the goods were lost by the
owner, and in arson that the house had been burned, for
otherwise the accused might be convicted of murder when
the person alleged to be murdered was alive, or of larceny

45 OR.——39

when the owner had not lost the goods, or of arson when the house was not burned. But when the general fact is proved the foundation is laid, and it is competent to show by any legal and sufficient evidence how and by whom the act was committed, and that it was done criminally."

The building described in the indictment is conceded to have been burned, and there were, we think, sufficient circumstances tending to show that it was of incendiary origin to justify the admission of the confessions of the defendant. The goods in the building belonged to his mother; they were overinsured; he remained in Lebanon over the Sunday before the fire, contrary to his usual custom; he was noticed to be "fidgety" and uneasy the day before the fire; and after the fire he told one witness that the stovepipe fell down; another, that after retiring he read and smoked for a time, and then laid his cigar on the table by his bed, and the next thing he knew he was awakened by smoke and flames; thus leaving the inference that the fire may have originated from the lighted cigar. The circumstances were competent as tending to show a criminal agency, and were for the determination of the jury.

*The remaining error is based on the action of the trial court in limiting the argument of counsel on either side to one hour. The time which may be occupied by counsel in the argument of a cause to the jury rests in the sound discretion of the trial court, and the appellate court will not interfere therewith unless there was an erroneous exercise of such discretion: *Hurst* v. *Burnside*, 12 Or. 520 (8 Pac. 888); 2 Enc. Pl. & Pr. 702; 12 Cyc. 568. The record before us does not disclose any abuse of discretion. It simply states that at the close of the testimony the court limited the time for argument to the jury to one hour on

* That part of the opinion between stars was reconsidered on a second hearing and the later opinion controls.          REPORTER.

each side, to which ruling the defendant, by his counsel, then and there excepted. This is not enough. It is true that all the testimony is in the record, from which it would seem that an hour on each side was a very short time in which intelligently to present the case to the jury; but there may have been ample reasons why the trial court could not, under the circumstances then existing and the business before the court, permit a longer time.*

There are some other minor points in the case, but none of them are worthy of comment.

It follows from these views that there was no error in the record, and the judgment of the court below must be affirmed.

---

Decided 19 June, 1905.

ON REHEARING.

For appellant there was an oral argument by *Mr. Henry H. Hewitt* and *Mr. J. J. Whitney.*

For the State there was an oral argument by *Mr. Andrew M. Crawford,* Attorney General.

MR. JUSTICE BEAN delivered the opinion.

A rehearing in this case has been allowed and had. It is stoutly insisted that the court erred in holding: *First,* that the decision of the trial court as to the admissibility of the alleged confession of the accused is not to be disturbed on appeal unless for clear and manifest error; and, *second,* in affirming the action of that court in limiting in advance of the argument the time to be occupied by counsel to one hour on each side. We have examined both of these propositions with care, and adhere to the first, for the reasons stated, citing, as additional authority, however, *Holland* v. *State,* 39 Fla. 178 (22 South. 298).

3. But we are convinced that we should recede from the latter. The ground of our conviction is not one presented at the former hearing. The opinion was based on *Hurst* v. *Burnside*, 12 Or. 520 (8 Pac. 888), a civil case, and attention was not called to the fact that by limiting the argument the defendant had been deprived of a constitutional right, namely, that of being fully heard by counsel. It is declared in the Bill of Rights that, "in all criminal prosecutions, the accused shall have the right * * to be heard by himself and counsel": Section 11, Bill of Rights, Const. Or. (B. & C. Comp. p. 29). A similar guaranty is contained in the federal constitution : Sixth Amendment, U. S. Const. This means that the accused shall have the right to be fully and fairly heard, or else it means nothing. Anything less would be an invasion and restriction of the right guarantied. "This right is of inestimable value," says the Supreme Court of Mississippi, in *Wingo* v. *State*, 62 Miss. 311, "not only to the accused, but to the administration of public justice. Under similar constitutional provisions, it may be regarded as settled law in American courts that any abridgment of this right which deprives the accused on trial of the time necessary to make his defense fully and fairly is an error, for which a new trial will be granted"; citing many authorities. To the same purpose is the expression of the court in *Yeldell* v. *State*, 100 Ala. 26 (14 South. 570, 46 Am. St. Rep. 20): "Courts are established for the administration and promotion of justice. If time and patience are not accorded a defendant, proceeded against in a cause in which his life or liberty is endangered, this high end and aim of the court would be subverted. If time is valuable and is pressing, if patience has been sorely taxed, any just judge will be careful, yet, to allow full and fair opportunity to counsel to present his client's defense. This much is guarantied in the constitution, and no more." So, in

*People* v. *Green*, 99 Cal. 564, 567 (34 Pac. 231), the prin-
ciple was stated as not to be questioned that the defend-
ant has a constitutional right "to be fully heard in his
defense by counsel, which it is not within the discretion-
ary power of the court to deny or abridge." See, also,
*People* v. *Keenan*, 13 Cal. 581 ; *Walker* v. *State*, 32 Tex. Cr. R.
175 (22 S. W. 685).

This guaranty vouchsafed to the defendant, however,
is not inconsistent with the existence of the power in the
court to regulate the exercise of the right of argument, so
as to prevent an abuse thereof, by restricting it to a dis-
cussion of the matters relevant to the cause, and prevent-
ing counsel from wasting the time of the court by useless
repetition. But, as said by the Supreme Court of Califor-
nia in *People* v. *Green*, 99 Cal. 564 (34 Pac. 231): "It must
always be a difficult as well as a delicate matter, in a case
like this, for the court to determine in advance what lim-
itation should be imposed upon counsel against their con-
sent"; for, as stated by Mr. Justice BLECKLEY, "How can
the court know, in hours and minutes, how long the argu-
ment ought to be ? There is no rule of practice that set-
tles it by what he may suppose sufficient. As argument
progresses, he may confine its range to the facts and law
of the case, and may interdict idle repetition; but while
counsel speak to the point, and proceed in good faith,
wasting no time, how can the court forbear to be patient,
and hear what is said ? When it is manifest that the dis-
cussion is complete and the subject exhausted, a stop may
be ordered": *Williams* v. *State*, 60 Ga. 367 (27 Am. Rep.
412). Some courts rest this matter of regulation upon the
sound discretion of the trial court: *State* v. *Collins*, 70
N. C. 241 (16 Am. Rep. 771); *Williams* v. *Commonwealth*,
82 Ky. 640. But the better doctrine seems to be that the
court may adopt suitable rules and limitations, and exer-
cise such supervisory control over the course of the argu-

ment as may seem reasonably calculated to prevent the abuse of the right to be fully heard, and that otherwise it cannot exercise any discretion in the premises limiting or curtailing such right: *Lynch* v. *State*, 9 Ind. 541; *Word* v. *Commonwealth*, 3 Leigh, 743; *Jones* v. *Commonwealth*, 87 Va. 63 (12 S. E. 226); *White* v. *People*, 90 Ill. 117 (32 Am. Rep. 12).

4. Now, as shown by the record in this case, two counsel appeared for the accused. It required the greater part of three days to try the case. There were twenty-one or twenty-two witnesses examined, the testimony of whom, when transcribed and typewritten, filled a volume of 160 pages, and there were fifty-one exhibits introduced in evidence. Much of this testimony was circumstantial and conflicting, and the case was attended with many complications that required careful analysis on the part of counsel both for the State and for the defendant. Notwithstanding this, the court, at the close of the testimony, informed counsel that but one hour would be allowed on a side for the argument of the case. To this ruling defendant's counsel excepted at the time, and one of them then and there declined to address the jury, on the ground that the time limited was too short. The other spoke for about three quarters of an hour. Considering the whole case and the character of the testimony, we are clear that the limitation of an hour was too restrictive to permit a full and fair discussion of the case before the jury, and a violation of defendant's constitutional rights. The foregoing authorities afford ample illustration, and fully sustain this conclusion.

It follows that the affirmance must be vacated and the judgment reversed, and a new trial ordered.

                                        Reversed.