BESSIE HARRIS v. THE STATE.

*No. 1026.     Decided June 3rd, 1896.*

**1.   Evidence to Refresh Memory—Bill of Exceptions.**

On a trial for murder, where it was objected that witnesses were permitted, in order to refresh their memories to read their testimony given at the examining trial of other parties to the same offense, the bill of exceptions, to be available, should have shown that the witnesses themselves did not request to refresh their memories from such testimony; and should set out the questions and answers, that is, the testimony itself that was then elicited.

**2.   Evidence—Hearsay.**

Where a witness knows nothing of the matter inquired about of his own knowledge, and his testimony upon the point would be merely hearsay, it is not error to exclude his testimony.

**3.   Examination of Witness—Bill of Exceptions.**

Where on the examination of a State's witness who, apparently was unfriendly to the State, the jury having been retired, the judge admonished the witness, and, among other things, said to him, "You will be handled for perjury, if you do not tell the truth in this case." Held: The bill of exceptions is fatally defective in failing to show, that any testimony at all was elicited from the witness by the action of the court, nor in what manner defendant was prejudiced by such action.

**4.   Leading Questions—Bill of Exceptions.**

It is largely a matter in the discretion of the court, as to whether a party shall be permitted to ask his own witness leading questions. If the witness is an unwilling or reluctant witness, the privilege of propounding leading questions is not improper.

**5.   Murder—Indictment—Allegation that the Means Used were Unknown.**

If the instrument, by which a homicide is committed, be not known, it is sufficient if the indictment aver that fact by an allegation that "the said defendant did then and there, with malice aforethought, kill B., by some means to the grand jurors unknown."

6.  Same—Diligence by Grand Jury to Ascertain the Means.

On a trial for murder, where the evidence adduced is vague and uncertain as to the means used in its perpetration, it is unnecessary for the State to show the diligence used by the grand jury to ascertain what means, instruments or weapons were used.

7.  Principals—Accomplices and Accessories—Charge.

Where, on a trial for murder, the evidence indicates that, if guilty at all, defendant was a principal, it was not error for the court to refuse to charge upon the law of accomplice or accessory to the murder.

8.  Statements and Confessions of Accused—Charge, as to, Limiting and Restricting.

On a trial for murder, statements and confessions by the defendant are admissible as original evidence, and the court is not required, in the charge, to limit and restrict the purposes of the same, and it would be error to restrict it to impeachment purposes, when the defendant has not been a witness in the case and testified as to the matter.

Appeal from the District Court of Live Oak.   Tried below before Hon. M. F. Lowe.

Appeal from a conviction for murder in the second degree; penalty, five years' imprisonment in the penitentiary.

Appellant, Bessie Harris, and D. H. Harris and Matilda Harris, were jointly indicted for the murder of A. S. Blackmon, on the 23rd of June, 1895, it being alleged in the indictment, that the murder was committed "by some means to the grand jurors unknown."   On motion of the parties a severance was had, and Bessie Harris alone placed on trial.

In brief, the facts developed on the trial were substantially as follows:   The Harris and Blackmon families lived some half mile apart, and were very intimate.   Bessie Harris, the defendant, was an unmarried girl of about 20, and deceased, Albert Blackmon, was a young unmarried man about 21 years old.   Bessie Harris' sister, Dollie, was a young girl a year or two younger than she was.   Young Blackmon seems to have divided his attentions about equally between the two girls.   On Sunday evening, the 23rd of June, 1895, about sun-down, Albert Blackmon was going from his father's house to turn out his father's horse, and at the same time his three sisters were starting over to visit the Harris girls.   He rode along with them until they reached the place where he turned the horse loose, and they then all proceeded together on foot—he taking with him the rope which had been upon the horse's neck.   As they were passing the house of a Mexican, they saw Dollie Harris there, and Albert went to where she was and his sisters went on to the cow pen, where defendant, Bessie, and John Davis, her nephew, were milking.   Bessie sent the milk by John to her father's house, and she and the Blackmon sisters went back to the Mexican's where Dollie and Albert were; the parties stayed and talked there for quite a while, and then went over to the Harris house, reaching there after dark, and after Mr. and Mrs. Harris, the father and mother of Bessie, had apparently retired to bed—the mother inside the house and the father to his bed in the yard near the well.   The young folks talked there some two hours, when Eva Blackmon suggested it was time to

return home, and asked the Harris girls, Bessie and Dollie, to go part of the way with them. The party started, Albert and Dollie in front. At a point, a few yards from the gate and in front of the well, Albert and Dollie were passed by the others, who proceeded on towards the Blackmon house. When they had gone about half way to Blackmon's and Bessie was about to leave them to go home, Eva Blackmon said, they would wait for Al' rt, and Bessie said: "No, you might have to wait a long time;" and they parted, Bessie going back down the road whistling. Next morning, it was found that Albert had not returned home, and, after breakfast, Eva went back on the road to look for him; and, about 100 yards nearer his home than the spot at which Bessie had parted with them the night before, she found his dead body beside the road under a hackberry tree. The alarm was given, and Stedman, a justice of the peace, was sent for to hold an inquest upon the body. He testified that "about 12 o'clock that day, found the dead body of a man that was reported to me as the body of A. S. Blackmon, This was in Live Oak County, Texas. The deceased lay on his back and partly in the road that ran from the Harris residence to the Blackmon residence; there was a mark around the neck of the deceased, and a bruised place under the left ear; and, the hands of deceased were bruised, as if he had clasped or gripped a rope; his feet were drawn up. I made no further minute examination of the body, but turned that part of the business over to Dr. Gillett, and got Mr. W. E. McCampbell and others to make some examination of the hackberry tree near which the body of deceased lay."

Bessie Harris testified at this inquest, but made no mention of how deceased met his death.

McCampbell testified: "The hackberry tree under which deceased was lying was close to the road, and a large dead limb—about six inches or more in diameter—extended out to the road, and, perhaps, over the rut on that side. This limb was broken off, and left the extended prong about six or eight feet in length. Where it grew out from the body of the tree was about five or six feet from the ground, but it extended upward, and had a cotton rope similar to the one exhibited in court, suspended from the limb at a point about three feet from the trunk of the tree and about seven or eight feet from the ground. The point from which the rope was suspended, would be outside of the road; and I noticed to see if horse tracks were there, and there were none. I then, with the assistance of Mr. T. J. Anderson, climbed the tree and know that it had not been climbed by any person, for there were little dead twigs, that I broke off in climbing the tree, that had not been disturbed. I then went out on the limb from which the rope was suspended, and saw that there had been no abrasion made by the rope on any of the top part of the limb. I knew Albert Blackmon well, and he would weigh about 145 pounds. I got one of the Lyne boys of about the same weight to pull down his whole weight on the end of the rope that had been cut, and this caused the rope to tighten as it had been tied

in a slip-knot; and also caused the decayed shell, on top of the limb, nearly as thick as my hand, to break in; and, on the side of the limb, rubbed off the dead bark. I did this under the instructions of the justice of the peace, after he came. This was all in Live Oak County, Texas. I then assisted Dr. Gillett to make an examination of the dead body; found the bruised places extending entirely around the deceased's neck and about the size of the rope that was suspended from the tree, which, I say, is similar to the one exhibited in court. There was also a bruised place under the left ear, and the doctor showed me some marks in deceased's hand that were about the size of the rope in question, and were in a position that could have been made by pulling on a rope. Deceased was a working man and worked regularly on a farm, and his hands were calloused; and, these marks were not nearly so distinct as the one around his neck; other than these, I saw no marks of violence on the deceased's body. About forty yards from this tree, and back towards the creek and Harris' house, and on the opposite side of the road, and some twelve or fifteen feet from the road, there was a place where the weeds and grass was thick, too thick, in fact, for a footprint to make a track, except to mash down the grass and weeds, but there would be no impression made in the ground to show the size of track, or whether made by man or woman; and, in the road, there had been so much passing that you could tell nothing. At this place there had been recently some one, or something, rolling around or scuffling, for the weeds and grass were mashed down for a space in diameter from six to ten feet; and, from this place, and in the direction towards the road and tree where deceased lay, there had parties passed carrying something that had mashed the weeds over and caused them to lean in the direction of the road and tree; and, on either side of this trail, where weeds were pushed over towards the tree, there were places where grass was mashed down as if by footprints of parties carrying something, some being on one side of the body, and some on the other."

M. V. Hogan and Jim Goodwin, two young men of the neighborhood, who had had some trouble with deceased, were arrested. At their examining trial, Bessie Harris testified (as shown by the testimony of Stedman, the justice, who held both the inquest and examining trials), "that she had been part of the way home with the three Blackmon girls that had visited her father's house on Sunday night, and that she went about half way home with them; and that deceased and her sister, Dollie, had been left behind; that, as she went home, deceased jumped out of the weeds and scared her; and, that then they talked awhile together when deceased told her that he was going to hang himself. That he, deceased, went to the hackberry, where the deceased's body was found, and clasped the tree with his legs, and hung himself. That she stood off some distance and did not look at him, and that when he was dead she cut him down with his own knife, which deceased had given her and told her to cut him down so that his sisters would not be scared when they came along and saw him hanging there. The knife here

shown witness is the one we had in court on the examining trial, and then she admitted that that was the knife which deceased gave her, and the one with which she cut him down.  Also, the handkerchief, here now in court, is just like the one we had in court on the examining trial, and defendant then admitted it was her handkerchief, but said she had loaned it to deceased the evening before." Hogan and Goodwin were discharged upon this examining trial.

The above are the main features developed by the facts in evidence on the trial.

Defendants saved bills of exception to the court's action in permitting the witnesses to read and refresh their memories from, and the use by the State of, the testimony taken at the examining trial of Hogan and Goodwin.  Also, the District Attorney being permitted to ask leading questions, and to the conduct of the court in the examination of the State's witness, John Davis, and the remark of the court to said witness, "you will be handled if you do not tell the truth in this case."

*F. G. Chambliss,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

[No brief for the State found with the record.]

DAVIDSON, JUDGE.—Appellant was convicted of murder in the second degree, and given five years in the penitentiary, and prosecutes this appeal.  Appellant, in her first bill of exceptions, claims that she was prejudiced by the action of the court in permitting the witnesses, John Davis and Dollie Harris to read certain testimony taken on the examining trial of Hogan and Goodwin, tried for the same offense; and also complains that the court erred in using said testimony in examining said witnesses.  The ground of objection urged is that the said written testimony was not certified to by the justice, and that the trial was in a case against other defendants, charged with the same offense, and that the appellant in this case was not a party in said preliminary examination.  The court in his explanation to said bill, shows that when he used said examining testimony, it was only for the purpose of refreshing the memory of the witnesses named, and that at that time the jury had retired. Said explanation, however, still leaves that part of the bill with reference to the course pursued in the examination of the witnesses by counsel in connection with the examining testimony intact.  The bill does not show how said examining testimony came before the court and jury. If it was at the request of the witnesses themselves, in order to see what they had testified to on a former trial, involving the same facts, it was competent for them to have recourse to said examining testimony, if they should say it would refresh their mind, regardless of whether it was certified to by the justice or not.  In order to have availed the appellant, the bill should have shown that said witnesses did not request the use of said

examining trial testimony, and that they did not identify and recognize the same as the testimony given by them before the justice on the trial of Hogan and Goodwin.    And, moreover, in order for this court to determine whether or not any injury resulted to the appellant from the use of said testimony, the questions and answers—that is, the testimony itself that was then elicited—should have been contained in the bill.    This was not done.    Appellant has a bill of exceptions to the refusal of the court to admit the testimony of one T. J. Anderson.    The court, however, in his explanation to the bill, shows that the said Anderson knew nothing of the matter inquired about of his own knowledge, and that his testimony upon the ·point was merely hearsay.    The court did not err in refusing to admit such testimony.    Appellant also excepted to the action of the court with reference to the witness, Davis, introduced by the State.    She complains that the court permitted leading questions to be propounded to said witness, and the court undertook the examination of said witness, and, among other things, during said examination, said to the witness that he would give him a chance to put himself right before he left the stand, and he wanted him to tell the truth about this matter, and that he stated to said witness, "that you will be handled for perjury if you do not tell the truth in this case."    The court in his explanation to said bill, says that all that transpired between him and said witness after the jury had been retired, and that it was then that he insisted on the witness telling the truth about the matter, and that he would be handled for perjury, etc., if he did not tell the truth.    How this examination by the court came up is not explained; nor is it shown what answers, if any, the court elicited from the witness.    In the absence of such showing, we are not in a position to determine whether the action of the court was prejudicial to the appellant or not.    We would here observe that the examination of witnesses on the part of the State, as a rule, is confided to the prosecuting attorney, and the court should interfere in such examinations with great caution.    He should certainly refrain from any attempt to coerce testimony, much less to menace or bulldoze the witness; and if it had been shown in this case that by the action of the court in threatening the witness with the punishment for perjury, testimony material to the State against the appellant had been elicited, this court would not hesitate to reverse the case.    The bill, however, is fatally defective in failing to show that any testimony at all was elicited; and the court explains that what he did in the case with reference to the witness was after the jury had retired; and even it is not shown that any material testimony was elicited from said witness by the action of the court.    As far as the course pursued by the court in permitting leading questions to be propounded by the District Attorney to the witness, Davis, as has been repeatedly held by this court, that is a matter largely in the discretion of the trial judge.    If the witness being examined is an unwilling or reluctant witness, this being made manifest, the privilege of propounding leading questions to a witness called by the State is not improper.    The bill in this respect is defective, in that it does not ad-

vise us as to the attending conditions when the court permitted leading questions to be propounded by the District Attorney to the State's witness.    The indictment, in alleging the means of death, uses the following language: "That the said defendant did then and there, with malice aforethought, kill A. S. Blackmon, by some means to the grand jurors unknown."    Appellant insists that this indictment is defective, because the means or weapon with which the homicide was committed is not stated.    With reference to a homicide committed where the weapon or instrument is not known, Mr. Wharton says:    "If the instrument by which the homicide was committed be not known, it is enough for the indictment to aver such fact; and under the circumstances the want of specification will be excused on the same principles as allow the non-setting out of a stolen or forged paper, when such paper is lost or in the prisoner's possession.    Thus, where the fourth count of the indictment averred that the defendant, 'in and upon the said G. P., feloniously, willfully, and of his malice aforethought, did make an assault, and him, the said G. P., in some way or manner, and by some means, instruments, and weapons to the jurors unknown, did then and there feloniously, willfully, and of malice aforethought deprive of life, so that he, the said G. P., then and there died,' this was sustained by the Supreme Court of Massachusetts.    'The rules of law,' said Chief Justice Shaw, when charging the jury, 'require the grand jury to state their charge with as much certainty as the circumstances of the case will permit; and if the circumstances will not permit of a fuller and more precise statement of the mode in which the death is occasioned, this count conforms to the rules of the law.' "    See, Whar. on Hom., Sec. 818.    The pleader in this case appears to have followed the rule here stated.    Appellant also contends that some proof should have been offered that the means of death was not known to the grand jury which presented the bill of indictment, insisting that a matter of this sort is within the rule laid down by this court with reference to the allegation in thefts as to the unknown owner of property alleged to have been stolen.    We know of no particular case which would require us to adopt the same rule with reference to indictment for murder in alleging the means of death as in indictments for theft.    We have held, in the character of cases referred to by counsel, that where the proof on the trial made no suggestion that the owner of stolen property, by the use of diligence, might have been ascertained, the State would be still compelled to show that reasonable diligence was used by the grand jury to ascertain the name of the owner. Applying the same rule here, the evidence on the trial indicates only in a vague and general way what means did cause the death of the deceased.    We are inclined to the opinion that the homicide was committed by strangulation, caused by the use of a rope; or it may have been done by a blow back of the ear with some instrument.    In a case like the present, where it is doubtful how death was caused, it is allowable to charge that it was done by some means unknown to the grand jury. Appellant complains that the court should have given the appellant the

benefit of a charge on the theory that she may have been an accomplice or an accessory, and that the jury should have been instructed to acquit. her if they believed that she was either an accomplice or an accessory. The court instructed the jury that before they could convict appellant they must find beyond a reasonable doubt that she was a principal, and the evidence, to our view, indicates that, if there was on her part any guilty participation in the alleged homicide, it was neither as an accomplice nor an accessory, but as a principal. Appellant complains that the court did not instruct the jury as to the purpose for which Stedman's testimony as to the statement made by the appellant on the trial of Hogan and Goodwin was admitted in evidence, and she insists that the purpose of such testimony should have been restricted by the court to the purpose of impeaching her testimony. She was not a witness in the case, and for the court to have instructed the jury as insisted by appellant would have been error. Moreover, this testimony was admitted as original evidence, as her statements or confessions with regard to the homicide, and her connection therewith. Appellant contends that the evidence is insufficient to sustain the verdict. We have examined the record carefully, and in our opinion it does sustain the finding of the jury. It is a most peculiar case, but we cannot account for the acts, conduct, and statements of the appellant on any other reasonable hypothesis than that she was a guilty participant in the murder of the deceased. There being no errors in the record, the judgment is affirmed.

*Affirmed.*

HURT, Presiding Judge, absent.