### ROBERT AND CHARLEY JONES v. THE STATE.

No. 2829.   Decided January 21, 1914.

Rehearing denied February 11, 1914.

**1.—Murder—Evidence—Leading Questions—Unwilling Witness.**

Where the State's witness was a reluctant and an unwilling witness through-out, being very much in sympathy with the defendants and the influence and domination of her mother, who was a strong partisan of the defendants, there was no error in permitting State's counsel to propound to her leading questions.

**2.—Same—Evidence—Conspiracy.**

Where, upon trial of murder, it was shown that the party who purchased gun shells in the presence of one of the defendants sympathized with the trouble the defendants had with deceased, and in fact acted with them in securing the gun and shells with which deceased was afterwards killed, etc., there was no error in admitting this state of facts in evidence.

**3.—Same—Law in Force—Charge of Court.**

While it is true that under the law in force when the trial began, the court was not required to read his charge to the jury before the argument began and the trial should have been conducted under the old law, but there was no bill of exceptions on this ground, the same can not be reviewed; besides, the court instructed the jury under the law as it existed at the date of the alleged offense, and there was, therefore, no error.

**4.—Same—Indeterminate Sentence Law.**

The indeterminate sentence law as it existed at the time of the trial having been declared unconstitutional, the contention that the court ought to have instructed the jury under the recent law which does away with degrees in murder is without merit.

**5.—Same—Rule Stated—Penalty.**

Where the trial of murder began under the old law, it was proper to complete the trial under the law as it existed at the time the trial was begun, and to require the jury to assess the penalty for whatever offense defendants might be found guilty.

**6.—Same—Manslaughter—Charge of Court—Insult to Female Relative.**

Where, upon trial of murder, the evidence showed that the publication of a certain newspaper article, which was claimed reflected upon the mother of defendants, had nothing to do with their taking the life of deceased, and that according to their evidence, they acted in self-defense; that there was no statutory adequate cause, and the court's charge on manslaughter applied the law to the facts in the proper manner, there was no error in refusing defendants' special requested charges thereon.

**7.—Same—Self-defense—Charge of Court.**

Where, upon trial of murder, the court submitted a fair and full charge on self-defense as it applied to the evidence, there was no error.

Appeal from the District Court of Erath.   Tried below before the Hon. W. J. Oxford.

Appeal from a conviction of murder in second degree; penalty, fifty years imprisonment in the penitentiary for each defendant.

The opinion states the case.

*J. C. George* and *Marshall Ferguson* and *J. B. Keith,* for appellants.—

On question of the court's action in reading his charge to the jury before the argument began and not reading same under the present law: Williams v. State, 18 Texas Crim. App., 409; Woodall v. State, 58 Texas Crim. Rep., 513, 126 S. W. Rep., 591.

On question of the court's error on charge of manslaughter: Snead v. State, 158 S. W. Rep., 530; Wheeler v. State, 54 Texas Crim. Rep., 47, 111 S. W. Rep., 1022; Gant v. State, 55 Texas Crim. Rep., 284, 116 S. W. Rep., 801; Reinhardt v. State, 609 Texas Crim. Rep., 662, 133 S. W. Rep., 265; Barnes v. State, 61 Texas Crim. Rep., 37, 133 S. W. Rep., 887; McHenry v. State, 54 Texas Crim. Rep., 477, 114 S. W. Rep., 115; Ivory v. State, 87 S. W. Rep., 699; Manning v. State, 85 S. W. Rep., 1149.

On question of court's failure to submit defendant's requested charge on newspaper article as adequate cause: Love v. State, 158 S. W. Rep., 525; Stapleton v. State, 56 Texas Crim. Rep., 422, 120 S. W. Rep., 866; Willis v. State, 75 S. W. Rep., 790; Keith v. State, 50 Texas Crim. Rep., 63; Morrison v. State, 39 id., 519; Floyd v. State, 52 id., 103; Casey v. State, 54 id., 584.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—The appellants were prosecuted, charged with the murder of their father, found guilty of murder in the second degree, and their punishment assessed at fifty years confinement each in the penitentiary.

The evidence would show that deceased was the father of a number of children; that he was harsh and brutal in his treatment of his children at times. That deceased and his wife had separated once on account of his conduct towards his wife, but they had, after he had made promises, again renewed their marital relations. The wife, at the time the killing took place, was visiting a married daughter. The evidence would tend to show that when he and his wife had separated, that there was some talk in the neighborhood, and deceased feared that the matter of his conduct would be investigated by the grand jury, and he had told his wife and children that if the matter was carried before the courts or grand jury he would get a gun and kill all of them. That in the afternoon, before the homicide took place that night, some of the children were summoned before the grand jury, and the oldest girl at home left, and informed appellants of the fact that the summons had been served. This puts the matter in as strong a light for appellants as the record would justify up to this stage of the proceeding.

The State's testimony would show that Robert Jones and his brother-in-law, Mr. Tackett, were in Dublin during the day of the night of the killing, and that Mr. Tackett purchased a box of shells that day. Robert Jones being in the store at the time, having come in the store with Mr. Tackett, left with him. That night Robert Jones secured a shotgun at his father-in-law's and the father of Mr. Tackett, who purchased the

shells. Deceased was killed with this gun, and the shells were identical in make and kind as those purchased by Mr. Tackett. It appears that all of deceased's family were absent from home on the night of the homicide, except deceased and two of his smaller children, Florence and Junie Jones. Florence Jones testifies as follows as to the occurrences she witnessed on the night of the homicide: "Papa, June and myself were at home for supper that night, and no one else. I did not see Robert nor Charley that evening about supper time—I had not seen them at any time that day since early morning. After supper, papa, Junie and I went to bed. We went to bed about 9:30 o'clock. My father undressed before he went to bed. He had on his night clothes. He slept in the front room—southwest room. My bed was located just outside on the porch from my father's bed. Junie was sleeping on the back porch of the house. Nothing happened before we went to bed. I never noticed anything unusual in my father's manner and demeanor. He seemed to be pleasant and agreeable to me and Junie. He didn't have much to say. I woke up in the night when the shots began to fire. I do not know the size of the room where my father slept. There is no fireplace in that room—the mantel board is between the two doors—no fireplace there. There was one dresser in the room. The house faces the west. The southwest room was generally used for a sitting room. There was just a wall between my bed and my father's bed and there was a window beside my bed, in the wall. The doors and windows were all screened. The first thing that attracted my attention that night was the shot fired. I was asleep at that time. I had been asleep all night. The shot was fired about 1 o'clock. When I heard the shot fired, I raised up in bed and looked through the window into the room—I saw Charley standing close to the door, in the east side of the large room. I heard papa say: 'O! Allie, don't kill me.' He said: 'Don't shoot me any more, I will die anyhow.' I heard my father groan. At that time, I got up and went into the room—going through this front door that opened out on to the front gallery. When I got into the room, my brothers, Charley and Robert, were in the room. I did not see Uncle Allie Burnett there. I did not see Alvie Tackett there. There was nobody in the room but my two brothers and my father. I had gotten close to the east door that opens into the hall before Charley and Robert came to me. I don't remember which one of them came to me first. They both kissed me. They were both in the room. They said: 'It had to be done or he would have killed some of us or maybe all of us.' At the time they made this statement, my father was laying on his side across the bed. His head was north. I don't know whether his head was in the direction of the foot of the bed. The head of the bed was southwest and the foot was northeast. When I got into the room, my father was lying across the bed on his side, with his feet toward the south and his head toward the north. I don't know whether I remained in the room any longer than a minute or not. The next thing I did, I ran through the hall and out on the gallery and woke Junie up. Before

that, while I was in the room Charley had a shotgun in the room. There were two shots fired right close together before I went into the room, and before I went out on the back gallery to wake my little brother. In going out to wake up my brother Junie, I went out through the east door, through a little room, then through another room onto the gallery at his bed. When I got there my little brother was asleep, I waked him up. I told him to wake up, they were killing papa. I told him to jump up and put on his clothes. While I was there, Robert and Charley came out to the bed where we were. They told Junie they killed papa and that it had to be done. Charley gave Junie his watch and chain and knife and trunk key and told him to keep them till he came home. Robert gave me his watch and told me to keep that till he got home. They told us they would have to go to Stephenville. After we talked to them there, Robert took the shotgun and went right straight around the gallery west, and turned at the corner, and went down the north gallery west, and turned at the corner, in the direction of my father's room. After he got around there, I heard the gun snap, don't know how many times—several times. I don't know how long he remained around there at that time. When Robert came back he told Charley the gun wouldn't shoot. Charley told him that he guessed it had two empty shells in it, and he took the gun, threw out the empty shells and gave the gun to Robert. After Robert came back to where we were, he went back around there then. He traveled the same way this time in going around there that he did before. After he got back around there, I heard the gun shoot twice. Robert came back around there where we were. Junie and I were still there, think Charley was around there at the gallery somewhere—I did not see him at that particular time. After Robert came back the second time, he or Charley told Junie to go in there and light the lamp—it went out. There was a lamp burning in the room. The wick of the lamp was turned down tolerably low, wasn't burning very bright. The lamp was on the dresser when I woke up, and was lighted, and the lamp was burning in that condition when I went into the room where my brothers were. The lamp went out when the last shot was fired. Robert told Junie to go in there and light the lamp and Junie went in there and he said papa was breathing hard and he got scared and ran out of the room without lighting the lamp." The testimony of Junie Jones is, in substance, the same.

Dr. R. A. Miller testified he examined the body and found the four wounds. He says: "I tried to probe the wounds. Wounds in the localities that these were, it would be impossible, without an autopsy, to tell positively about the direction of the shots. I think I could tell the directions, with reasonable certainty. There was one of the wounds that was three or four inches above the right nipple. That was a kind of long wound, seemed like 2 or 2½ inches long. That was the only one in front. There was another wound about 2 inches below the point of the shoulder blade on the right side of the back, and another wound was about the upper portion of the lumbar vertebrae. That is on the back, and in fact,

part of the back bone was cut off by the shot about ⅓ of the side of the back bone, what is called the joint known as the upper lumbar vertebrae. Another wound 4 or 5 or 6 inches to the left side of the back, four wounds in all."

The evidence for the State would support the theory that the two brothers in Dublin formed the design to kill their father; traveled five miles to his home, went into the house in the dead hours of night, and killed him because of his past misconduct, and fear of his future misconduct. On the other hand, the theory of the defense is, and it is supported by the testimony of the defendants, and other facts and circumstances testified to, that their father had been brutal towards the children and their mother all the days of their lives; shortly before this their mother had separated from their father (deceased), and gone to her father's, carrying the youngest child with her. That at this time their father's misconduct towards his wife and children became known in the community generally, and there was some talk of prosecuting him on account of these misdeeds. Their father went to the mother determined to get the baby child, taking these two defendants with him. The mother and father became reconciled, and she returned home with their father. They say their father did not live up to the promises made on this occasion, but in a short time renewed his course of cruel and improper treatment toward their mother and the children. It is also made apparent of record that after getting the mother to return, the father (deceased) caused their mother to sign a statement acknowledging that she was the one who had been in error; that she was an opium fiend, and this had been the cause of her and her husband's troubles and disagreement, the statement completely exonerating the father. Robert Jones had seen this statement before; in fact was the person who carried it to the newspaper for publication. Charley Jones had not seen it until the afternoon before the homicide took place that night. It is further in testimony for the defense that deceased feared prosecution for his misdeeds, and had said that if the matter ever got in the courts, or any of them ever appeared before the grand jury, he would take his gun and kill his wife and all their children, including the son-in-law and daughter-in-law. During the afternoon when deceased and his children, Florence, Junie and Jessie, were the only ones at home, the constable appeared with a subpoena for some of the children to appear before the grand jury, Jessie being summoned, when she at once left home, went to her brother, Robert, and informed him of the fact. Robert then went to Dublin where Charley had gone earlier in the day. They ate supper at a relative's in Dublin. The testimony of the defendants is, that in view of the fact that their father had threatened the life of the entire family if the matter went into the courts, and the constable had summoned one of their sisters to appear before the grand jury, and had process for other members of the family, they became alarmed and were afraid their father would that night kill Florence and Junie, the only two children at home, and they decided to go home, get these two children, and carry

them to a place of safety. They say they had no intention of killing their father, but knowing his violent and dangerous disposition, they armed themselves as a matter of protection. Charley purchased a pistol in Dublin that evening, and on the way to the father's residence they went by the home of Robert's father-in-law, where he procured a shotgun. That they then went to their father's residence to get Florence and Junie. Robert Jones testified to his sister, Jessie, coming and telling him about the subpoena being served, and that it frightened him, and he took his wife and sister, Jessie, and went to Dublin, where they found his brother, Charley, at the home of their uncle, Allie Burnett. That they discussed the matter, and about the two children being at home with their father. He then says: "We stayed there till about 12 o'clock that night, Charley and I. Charley and I reached the agreement that we ought to get the two little children out from home if possible. We thought that we might find them on the back porch, on the bed, and we intended to slip in there and get them out. After we agreed to do that, we got in the buggy and drove on down the Dublin and Edna road to the branch. That is the road that papa would come in a part of the way if should come to town, about one-fourth or one-half mile.' When we were driving over that piece of road, we drove as fast as we could. We stayed off of that road until down towards home. After we got off of the Dublin and Edna road, we drove on down the Dublin and Purves road till we got to the other route and went around to my father-in-law's house. When we got there, I got out of the buggy and halloed three or four times, 'Hello, Mr. Tackett!' Mr. Tacket came to the door and I said: 'Mr. Tackett, we are in trouble tonight, papa has been subpoenaed to the grand jury and we are afraid he has killed the children, and I want your gun so if we meet him I will have some protection.' Mr. Tackett said: 'I can't let you have it, Robert, I can't let you have it.' He was standing on the gallery. The gallery is 'V' shaped. He walked to the end of the gallery and I passed on by him and I knew where the gun was sitting. I had been there from time to time, and knew where the gun set and I knew where the cartridges set, and when Mr. Tackett passed on, I brushed around him and went in there and picked up the gun and reached into the box of shells at the foot of the gun and got five shells, if I remember. The gun was also loaded. That made 7 shells in all. Charley and I then drove down the hill and around back to the place about 200 or 300 yards east of the cross roads. I jumped out there and tied the horse and got the remainder of the shells in the buggy. I suppose that was about a quarter of a mile from our father's house. We then went on up to the cross roads and listened about three minutes to see if we could hear any buggy going north or south. We thought at this time of night, he might be after us. We thought he might wait till this time and we walked on south down this road. We came on till we got to the edge of the hill and we were afraid to go on farther, there wasn't any light,—it was dark. We were afraid papa might be waiting for us or laying at the front possibly, thinking

we went to prayer meeting that night. We went around at the cow lot and stopped around the back way. When we got around there, we listened, and there we noticed the light for the first time. The light appeared to be in the front room. After listening there, we walked around the barn to the water trough. At the water trough we were close, we thought we heard the slam of a screen door, and we then listened about three minutes and couldn't hear any other noise, and we thought if he was about the front room or about the front, if we would pull off our slippers, we could walk to this place on the porch and get the children, and we pulled off our slippers. I set the gun by the trough and after we got our slippers off, Charley picked up the gun and we went on to the back yard and thought we could look over the partition in the back yard and into the windows of the room. We did not see papa. There was a light in the room. There was nobody in the bed. We thought papa was gone. We then walked back to this bed on the east porch, back porch. We found our little brother, Junie, there and he was still alive, and Charley said: 'Here is Junie, he is still breathing, but where is Florence, she is not here.' I said: 'Let's go into her room and see if she is in her bed.' We then walked on to this east screen door and took hold of the screen door and Charley walked in ahead of me— I was sorter to his side. We walked in through the kitchen and dining room and through the hall and came up to the front room and into the front room. We were not expecting our father there. On entering this room, to our surprise, papa jumped up in bed and said: 'You sons of bitches,' I will kill you both,' and he whirled around with his right arm under him sorter and pulled himself up in bed, put his left hand to the gun which was leaning up against the bed. Charley then shot two shots, and papa had then grappled the gun and fell back on the bed sorter on one elbow, and when he fell back, he jumped up with his feet hanging off the bed and turned around his gun in his hand and started to fire on Charley, and Charley then shot with the pistol. Then after Charley shot with the pistol, papa jumped up from there and started around the bed. Charley threw the shotgun back and I caught it in my hand and had taken the shells out. I don't know what I did with the shells I took out of the gun. I was in such a fright. After I took the gun, I took the shells out and reloaded the gun and started toward the couch. Just after Charley shot, papa started for me and said: 'Robert, you bitch, I will kill you,' and just as he exclaimed this, he was on his elbow, on his right side like. I saw I didn't have any chance to run and get out of the room, and Charley said: 'Shoot, Robert, he will kill you,' and I fired two shots. When I shot, papa's face and breast were towards me. By this time, the room was nearly full of smoke—you couldn't hardly see. I pulled the first trigger and then the other as quickly as I could. I didn't even take aim——I had never shot a gun but twice before and don't know where I shot. I don't know whether he moved his position between the first shot and the second shot that I shot at that time. The light went out when I fired the second shot. The light glimmered, and

I heard papa's gun drop, and I gripped the gun as it dropped and I jumped forward and raked on the floor. I raked papa's gun. I took the gun I shot him with in my left hand and I started to unbreach it, and I felt the hammers were up on papa's gun, and I took the two shells out of papa's gun and set his gun behind the door and ran out with my gun." Charley Jones' testimony is, in substance, the same as Robert Jones.

The statement of facts is very lengthy, but this gives sufficient of it that the theories of the State and defendants may be clearly understood. If the theory of the defendants presents the correct theory, they would be justifiable in their course and conduct. If the State's testimony is the true one, it was predetermined killing, finally executed while the deceased was pleading for his life. There is much evidence in the record, both pro and con, tending to support each side of the case, but no useful purpose would be served by detailing it at length.

The first bill of exceptions relates to some questions to Florence Jones in regard to her mother using morphine, the objection being that the questions propounded "were leading and suggestive." The witness was a young girl, and the court, in approving the bill, states that "she was a reluctant and unwilling witness throughout, being very much in sympathy with her brothers, and being under the influence and domination of her mother, who was a strong partisan for her sons, the defendants on trial." As thus qualified the bill presents no error. Harris v. State, 37 Texas Crim. Rep., 441; Brown v. State, 38 Texas Crim. Rep., 597; Navarro v. State, 24 Texas Crim. App., 378; Nairn v. State, 45 S. W. Rep., 703.

In the next bill it appears that Q. Harper testified that Tackett and Robert Jones came into his store, and while in there Alva Tackett purchased some shells. This occurred on the day of the homicide. The objection urged was that "the defendants were not responsible for what Tackett did, and the mere presence of defendant, Robert Jones, where the transaction occurred was no evidence against him unless he assented to it or some fact from a unity of action might be inferred or implied, there being no evidence that Tackett was acting in said transaction in conjunction with or for the benefit of defendants. In approving the bill the court says: "This bill is allowed with the explanation that the evidence showed that Alva Tackett had married a daughter of the deceased, L. W. Jones, and a sister of defendants, Robert and Charley Jones. That Robert Jones was also married to a sister of Alva Tackett, that L. W. Jones, deceased, had publicly stated that Robert Jones had married into a low family. That on the morning of the day that the homicide occurred that night Alva Tackett and Robert Jones were together at the residence of Jack Tackett who was Alva Tackett's father. That they left said residence in company with each other and traveled to Dublin, a distance of five miles and in company with each other visited the store of the witness Quill Harper and Alva Tackett purchased the shells about which said witness testified, that Alva Tackett and Robert Jones then returned to Jack Tackett's residence together; that

on the night of said day Robert Jones and Charley proceeded to Jack Tackett's residence from Dublin and secured his, Jack Tackett's gun and some shells; that the same kind of shotgun shells loaded with the same kind of loads that was purchased by Alva Tackett in Dublin on that day in the presence of Robert Jones was delivered by the defendants, Robert and Charley Jones, to the officers at Dublin after L. W. Jones was killed and two exploded shells of the same kind and calibre as those purchased by Tackett at said time was found by the officers at the house of the deceased after he was killed and at the place where the State's witness say the defendants extracted same from the shotgun, and the same sized shot was also found in the body of the deceased as was shown to have been in the shells sold by witness, Quill Harper, to Alva Tackett, in the presence of the defendant, Robert Jones." Under such circumstances there was no error in admitting the testimony.

In the third bill of exceptions appellants complain that the court read his charge to the jury before the argument began. The trial of the case began on June 30, and was completed July 3. The law which requires that the charge shall be read to the jury before the argument begins became effective July 1, after the trial began, but before its completion. As the trial began prior to July 1, it should have been conducted under the law in force at that time, but in the bill no ground of objection is stated, and in the bill it is not claimed that such action on the part of the court was injurious to appellants. A bill of exceptions, to bring anything before us for review, must state the grounds of objection urged.

In the next bill appellants complain that the court in his charge defined murder upon express malice and murder upon implied malice (that is the two degrees of murder under former laws). Those complaints of the charge which relate to the first indeterminate sentence law, and complain that the jury was authorized to assess the penalty for murder upon implied malice, or second degree murder, are without merit, as the first indeterminate sentence law was declared invalid by this court in Ex parte Randall Marshall, recently decided. The contention that the court ought to have instructed the jury under the late law, which does away with degrees in murder, is without merit, as the offense, if any was committed, was committed prior to the time when the new murder statute became effective. In addition to this, the trial began under the old law, and under all of our decisions it was proper to complete the trial under the law as it existed at the time the trial was begun. It is further made to appear by the bill, that the court first prepared a charge under the laws effective July 1, and submitted it to counsel for appellants, and appellants filed exceptions to this charge on the ground, among others, that they were entitled to be tried under the law as it existed at the time the offense was alleged to have been committed, and at the time the trial was begun. These objections were well taken, and the trial court apparently so recognized and rewrote his charge, and instructed the jury the law as it existed at the date of the alleged offense, and in so doing he committed no error. There was a special exception

urged to the court submitting the issue of murder upon implied malice, that is, murder in the second degree. As this was the law of this State at the time the offense was committed, and was the law at the time the trial begun, it is clear the court committed no error under every decision ever rendered by this court. And as the indeterminate sentence law has been held to be void, the court correctly required the jury to assess the penalty for whatever offense appellants might be found guilty, if any.                       o

This disposes of all the bills of exception in the record, but as the trial was begun on June 30th, whatever law was in force at the time of commencement of the trial remained the law of that case until the trial was completed. Appellants could complain of the charge of the court in the motion for a new trial, for that was the law of this State on June 30th. In the motion for new trial appellants complain of the court's charge on manslaughter in several respects, and also complain of the failure of the court to give appellants' special charges Nos. 1 and 2 on the issue of manslaughter. In submitting the issue of manslaughter the court instructed the jury: "Now, if you believe from the evidence in this case, beyond a reasonable doubt that the defendants, Robert Jones and Charles Jones, acting with each other under such circumstances as to constitute them principals as that term is hereinbefore defined, in a transport of passion aroused by insulting words or conduct on the part of the deceased toward the mother or the sisters of the defendants, or by the deceased's ill treatment, if any, of the defendants and each of them or of their little brothers and sisters, or by all of those things combined, or by their taken in connection with all the other facts or circumstances in evidence, and if you further believe from the evidence that such conduct on the part of the deceased toward the relatives of the defendants herein named, or toward the defendants or either of them, constitute adequate cause to produce and did produce in the minds of the defendants, and of each of them, such a degree of anger, rage, resentment or terror as to render their minds incapable of cool reflection, and if you further believe from the evidence that while in said state of mind, in the State of Texas, and county of Erath, on or about the sixth day of June, 1913, they then and there did unlawfully and voluntarily shoot and kill the deceased, then you will find the defendants, and each of them, guilty of manslaughter and so say by your verdict and assess their punishment, respectively, at confinement in the penitentiary for any term of years not less than two nor more than five in your discretion."

The first complaint is that the court erred in not instructing the jury, as a matter of law, that the article tendered to the newspaper for publication hereinbefore referred to was adequate cause to reduce the offense to manslaughter as to the defendant Charley Jones, as it appeared from the evidence that Charley Jones first saw the article that evening before the homicide took place that night. We do not think this would be a statutory adequate cause. The article was not written by the

father, but was prepared and signed by the mother. It is true the article exonerated the father, and in it the mother took all the blame on herself for the family troubles, and admitted that she was a confirmed opium user. It may also be said that the testimony would show that it was prepared at the instigation of the father, and signed by her, and by the father sent to the newspaper for publication by Robert. It may also be true that Charley read it for the first time that evening, but the whole record discloses that he was aware that it had been written, and its contents before he left home, where he met his father. He knew all this before he went to town, and hunted up the newspaper man to get to read it. If this article did reflect on his mother, it purported to be the act of his mother and not his father, and she had signed her name to it, and all the family apparently had known of the existence of the letter for several days, and had been with the father during that time. In addition to this both Charley and Robert testify that this had nothing to do with their taking the life of their father; that they had no intention of killing him when they went out to his house, but went after the two little children, and they only killed him because he attempted to kill them. It could hardly be said to be manslaughter if one would read a communication in the afternoon, wait until twelve o'clock at night, arm one's self, ride five miles to the house of the deceased, then go in his house, and shoot him while he is in bed, as contended by the State. Neither would manslaughter appear if they had no intention to kill when they went in the house, and the deceased then grabbed his gun, and said, "You sons of bitches, I will kill both of you," and attempted to do so. While the court submitted the issue of manslaughter in the language hereinbefore stated, we seriously doubt the facts attendant upon the homicide would raise that issue. Especially is there no statutory adequate cause in the case. Of course, if there was statutory adequate cause testified to by any witness, it would be error for the court not to so instruct the jury, but no witness testifies to any fact that would be statutory adequate cause. The nearest any witness comes to this is the statement of Mrs. Jones, in the record, which was furnished to the newspaper for publication. In this she admits she had become addicted to the morphine habit. It is her admission, no statement of the deceased. Of course, appellants insist that this was written by the mother at the instance and demand of the deceased, their father, but Mrs. Jones in her testimony admits that she had got into that habit twice, and had had the opium habit for seven years; that her husband was trying to break her of it; so that when Charley Jones saw that his mother in the statement admitted that she had been taking opium, he knew that whether it was done at the request of his father or not, that the statement was true, and it being no statement of the father, but an admission of the mother that he knew to be true, it would not be statutory adequate cause. The court in his charge permitted the jury to take this fact together with all other facts in evidence in passing on whether the facts were such as to be adequate cause in law to cause passion,

having instructed them that by "adequate cause is meant such circumstances as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection."

Charley Jones himself testified: "We killed our father because he would have killed us right there if we had not killed him. We did not kill him because he whipped our mother. I cared for that, but I did not kill him for that. We did not kill him because he mistreated our little brothers and sisters. We did not kill him because he mistreated us. I did not kill him because he had mistreated Robert. I did not kill him because of any threat he made against me except the one he made there. I did not kill him because of any mistreatment of my mother. His cruelty to my mother did not prompt me to kill my father that night, nor the cruelty to the other children did not cause me to kill him. The sole and only cause that prompted me to kill my father was that my father was trying to.kill me. If he had not been trying to kill me in the manner and way I have detailed here, I would not have killed him regardless of these other things. These other things didn't contribute to it at all, except that I am afraid of him. But I would not have killed him on account of that fear. My fear didn't prompt me to kill him. What he did to my mother didn't prompt me to kill him, and didn't have anything to do with it." Under such circumstances we do not think anyone can contend that there was any statutory adequate cause as to this defendant. The court having instructed the jury on manslaughter as he did, it was no error to refuse the two special charges requested on this issue.

The court submitted the issue of self-defense fairly and fully under the facts, and in a way not complained of by appellants, and according to our view of the facts it was either justifiable homicide or murder. It is true that the evidence shows a course of continued ill-treatment by deceased towards his family, but when the circumstances are such as not to cause this misconduct to be deemed adequate cause in law to reduce an offense, then such facts become of cogent force and strength to prove the specific intent to kill under circumstances constituting murder. While the penalty assessed in this cause is severe, if the boys went to their father's house and killed him under the circumstances detailed by Florence and Junie Jones, we can not say that it is undeserved.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied February 11, 1914.—Reporter.]