[Decided April 24, 1893.]

## STATE v. HENDERSON.

[S. C. 32 Pac. Rep. 1030.]

1. HOMICIDE — HEAT OF PASSION — CODE, § 1727. — A design to kill, formed in the midst of a conflict, when reason is obscured by passion, does not make a homicide murder in the first degree, although the slayer has at the time enough reason and reflection left to enable him to know that he is about to take, and to intend to take, the life of his adversary.

2. EVIDENCE — RES GESTÆ.* — On a trial for murder, a declaration of the deceased, made at the time of and during the affray, is admissible as part of the res gestæ.

Clackamas County: THOMAS A. McBRIDE, Judge.

William Henderson was convicted of murder and appeals.   Reversed.

*Henry E. McGinn* ( *Alfred F. Sears*, and *Nathan D. Simon* on the brief), for Appellant.

*George E. Chamberlain*, attorney-general, and *W. N. Barrett*, district attorney ( *Geo. C. Brownell* on the brief), for the State.

Attorney for the defendant excepted to the ruling of the court in refusing to strike out the following portion of witness J. L. Thomas' testimony :   " I think he said, it seems to me he said, I will kill you, or made some threat; just what he said I wouldn't be positive."   Thomas said he made some threat, he thought it was, " I will kill you." That he made the threat there was no doubt, and he

---

*NOTE.— The question how near the main transaction a declaration must be to constitute part of the res gestæ is presented in a voluminous note to *Ohio & Mississippi R. R. Co.* v. *Stein* ( Ind.), 19 L. R. A. 733.—REPORTER.

thought the exact words were, "I will kill you." The witness was entitled to give the substance of the words used by the defendant and his best recollection of what the words were, and was not required to exclude all doubt from his mind. This is all he attempted to do, and certainly the jury were entitled to take it for what it was worth: 1 Greenleaf, § 440, 14th edition; Wharton, Criminal Evidence, § 461, 9th edition; *Boyer* v. *Teague* (N. C.), 19 Am. St. R. 560; *Printup* v. *Mitchell* (Ga.), 63 Am. Dec. 260.

Defendant's attorney also excepted to the ruling of the court in refusing to strike out the following testimony of witness Thomas: "Yes, he has cut me in the guts, he has killed me without a cause," because the witness did not know whether the defendant was there or not. We think the testimony of other witnesses shows that defendant was 'in the room when the remark was made, but in any event it was admissible as a part of the *res gestæ* and as a dying declaration: Code, § 686; 1 Greenleaf, Evidence, § 108 and n(a), 14th edition, *Sullivan* v. *O. R. & N. Co.* 12 Or. 397–401; *State* v. *Garrand*, 5 Or. 218; *State* v. *Saunders*, 14 Or. 305; *Thomas* v. *Herald*, 18 Or. 546.

Also to instruction, as to deliberation and premeditation, we do not think the court erred: *State* v. *Ah Lee*, 8 Or. 215 (221); *State* v. *Carver*, 22 Or. 602 (604); 9 Am. & Eng. Enc. 543; *State* v. *Garrand*, 5 Or. 216; 1 Wharton, Criminal Law, § 116.

That definition of cool blood was correct. See *State* v. *Ah Lee*, 8 Or. 215 (221); *State* v. *Anderson*, 10 Or. 463; *State* v. *Abrams*, 11 Or. 178.

MR. JUSTICE BEAN delivered the opinion of the court.

The defendant was indicted, tried, and convicted of murder in the first degree in killing one Cyrus Suter, by stabbing him with a pocket knife. The evidence tended to show that the deceased and the defendant had for some

two or three hours immediately prior to the homicide been playing cards and drinking liquor in a saloon at Canby; that some dispute had arisen over the game, and defendant had threatened to quit playing, but, at the solicitation of the deceased, continued in the game, and that just prior to the killing the dispute or quarrel was renewed, when the defendant again arose from the table and said he would not play any more, that Suter had been trying to run over him all day. The deceased, who was a much larger and stronger man than the defendant, then got up from the table, approached and took hold of the defendant,— whether in a peaceable or violent manner the witnesses are not agreed,—when, as claimed by the state, defendant stabbed him with an ordinary pocket knife, whereupon the deceased seized a chair and attempted to strike him with it, but was prevented from doing so by a bystander. The defendant and deceased then engaged in a hand to hand conflict, and defendant was thrown and held down on the floor by the deceased until the bystanders interfered. At some time during this affray the fatal wound was inflicted, but just at what time is not clear.

1. The court, in its instructions to the jury, in defining the crime of murder in the first degree, said: "The law also requires, in order to constitute murder in the first degree, that the design should be formed in cool blood, and not hastily on the occasion, and unless it is so formed in cool blood there can be no murder in the first degree; but by cool blood is not meant that a party must be in a wholly unexcited and philosophical state of mind. If he still has left the power of controlling the operations of his mind, and realizing the act that he is doing, and its nature and quality and wrongfulness, he may be said to be in cool blood, even though he may be somewhat excited or somewhat angry." As applied to the facts of this case, it seems to us this instruction must have led the jury to believe that no heat of passion on the part of the defendant

short of the dethronement of reason would reduce the crime below murder in the first degree.

To constitute murder in the first degree, it is necessary that the design to take life be formed and matured in cool blood and not hastily upon the occasion: Hill's Code, § 1727. It must be the result of a deliberate and premeditated act, in pursuance of a design formed and matured when the perpetrator is master of his own understanding, and after time and opportunity for deliberate thought. But if, after the mind conceives the thought of taking life, the conception is meditated upon, and a deliberate determination formed to do the act, then, no difference how soon the fatal resolve is carried into execution, it is murder in the first degree. But when the purpose or intent to kill is formed in the midst of the conflict, and followed immediately by the act, it can be only murder in the second degree, even if the passion and provocation are not sufficient to reduce it to manslaughter, for the time and circumstances are not such as to allow deliberate thought; and yet it is the result of a formed design and purpose to kill, and the perpetrator still has left the power of controlling the operations of the mind and realizing the act he is doing, and its nature and quality and wrongfulness, and, under the instruction given by the court in this case, would be in cool blood.

It is perhaps difficult to formulate any general rule as to the extent to which the passions must be aroused and the reason disturbed to reduce the offense below murder in the first degree, but it certainly will not do to say that reason must be entirely dethroned, and the passion so overpowering as for the time being to shut out knowledge and destroy volition: 2 Wharton, Homicide § 969; Kerr, Homicide § 68; *State* v. *Hill,* 1 Dev. & B. 491 (34 Am. Dec. 396); *Young* v. *State,* 11 Hump. 200. Such a mental disturbance would be almost if not quite equivalent to utter insanity. The rule, as stated by CHRISTIANCY, J., in the leading case

of *Maher* v. *People*, 10 Mich. 212 (81 Am. Dec. 781), is "that reason should, at the time of the act, be disturbed or obscured by passion to an extent which might render ordinary men of fair average disposition liable to act rashly, or without due deliberation or reflection, and from passion rather than judgment." And, says the same learned judge, "if the act of killing, though intentional, be committed under the influence of passion, or in heat of blood, produced by an adequate or reasonable provocation, and before a reasonable time has elapsed for the blood to cool, and reason to resume its habitual control, and is the result of the temporary excitement, by which the control of reason was disturbed, rather than that of any wickedness of heart, or cruelty or recklessness of disposition, then the law, out of indulgence to the frailty of human nature, or rather in recognition of the laws upon which human nature is constituted, very properly regards the offense as of a less heinous character than murder." Where the provocation is not sufficient to induce such a state of mind in an ordinary man of fair average intelligence, or if there has been time for the passion to subside and reason to resume its sway, or if there is evidence of actual malice, or if the act be perpetrated by, or circumstances indicate that it was the result of, a wicked and malignant disposition and heart, in all such cases it will still be murder in one or the other degrees. In order to reduce the offense below murder, all these things must be wanting, and the act must be done while reason is obscured by passion, so that the perpetrator acts rashly, and without reflection and deliberation. In the case at bar, it is apparent that the design to kill was formed at some time after the dispute and quarrel had commenced, and when both parties were more or less under the influence of passion; and the instruction under consideration asserts the principle, as applied to the facts, that although the design may have been formed in the midst of the conflict, when reason was obscured by passion.

it would still be murder in the first degree, if defendant
had left, at the time, so much of reason and reflection as
to enable him to know that he was about to take, and to
intend to take, the life of his adversary; and this, it seems
to us, fails to give to the defendant the indulgence which
the law accords to the frailty of human nature when pro-
voked to passion, and was error.

2. We think there was no error in refusing to strike
out the testimony of the witness Thomas as to the threats
made by the defendant, and also as to the statement of
the deceased. The former was the best recollection of the
witness as to what the defendant said, and the latter was
a declaration of the deceased made at the time and dur-
ing the affray, and was, therefore, a part of the *res gestæ*,
and admissible as such.

Another assignment of error is the use, by the court,
in its charge to the jury, of the expression, " enormous
bodily harm," in connection with the danger which
defendant must reasonably have apprehended before he
was justified in taking the life of Suter. The defendant
objects to this expression on the ground that, under the
facts as he claimed them to be, if he had reasonable ground
to believe that he was in danger of death or great bodily
harm, and, under such belief, killed Suter, he was justified,
and, that the expression, " enormous bodily harm," was
calculated to lead the jury to believe that the danger to
be feared must be more serious than great bodily harm.
The term "death or great bodily harm," is the ordinary
language of the books, although there are to be found
expressions in which the word enormous is used; but since
this case must go back for a new trial, it is unnecessary
for us to determine at this time whether "enormous" is
synonymous with "great," when used in this connection,
but it is proper to suggest in the language of the supreme
court of Tennessee, in a case in which it was held error
to use the word "enormous" in place of "great," that

" When the path is plain and well marked by long and constant travel, it is always safe to pursue it, while it is always dangerous to undertake to make a new one to the same end, or to qualify old, unbroken, and well-understood expressions of what the law is": *McDonald* v. *State,* 99 Tenn. 161 (14 S. W. Rep. 487).

The judgment is therefore REVERSED, and the case remanded for a new trial.