Argued October 19, reversed and remanded November 22, 1921.

## STATE *v.* WESTON.

(201 Pac. 1083.)

**Indictment and Information—Both Christian Name and Surname of
Accused Should be Stated.**

1. Generally, an indictment should state both the Christian name
and the surname of the accused.

**Indictment and Information—Use of Defendant's Initials, Instead
of Full Christian Name, Held not Fatal.**

2. Use of initials, instead of full Christian name of defendant,
*held* not fatal to indictment under Or. Code (Or. L., Tit. XVIII,
c. 7), where defendant stated on arraignment that the name under
which he was indicted was his true name.

**Homicide—Indictment, Charging That Defendant Killed Deceased by
Means to Grand Jury Unknown, Held Sufficient.**

3. Indictment, charging that defendant killed deceased by means
to the grand jurors unknown, *held* sufficient under Section 1439,
Or. L.; the indictment following form No. 1, page 1346.

**Homicide—Indictment Should Allege Manner of Killing Deceased,
Where Shown by Evidence Before Grand Jury.**

4. Indictment charging murder should allege manner by which
deceased was killed where shown by the evidence before the grand
jury, but an allegation that defendant committed the crime by some
means and manner to the grand jury unknown, or by some means,
instruments, and weapons to the jurors unknown, is sufficient when
the circumstances of the case will not admit of greater certainty.

Homicide—Allegation That Deceased was a Human Being Unnecessary.

5. It is not necessary for indictment charging murder to aver that the person killed was a human being.

Criminal Law—Distinction Between an "Admission" and a "Confession" Stated.

6. There is a distincton between admissions and declarations admissible under Section 727, subdivision 1, Or. L., and confessions within Section 1537; admissions being statements by a party or someone identified with him in legal interest of the existence of a fact which is relevant to the cause of his adversary, and confessions being declarations and admissions whereby a person accused of crime acknowledges that he committed it, or that he is an accomplice therein.

Criminal Law—Testimony as to Admissions by Defendant Held Admissible to Prove Corpus Delicti.

7. In murder prosecution testimony as to defendant's admissions that it would be necessary to get rid of the deceased, since deceased had caught defendant and others moonshining, *held* admissible as some proof of the *corpus delicti,* inasmuch as it tended to show the agency of the defendant.

Criminal Law—Order of Proof Regulated by Sound Discretion of Court.

8. The order of proof is regulated by the sound discretion of the court.

Criminal Law—Corpus Delicti Need not be Shown Before Connecting Defendant With Offense, Where Two Matters are Intimately Connected.

9. Though it is the general practice in homicide cases first to establish the *corpus delicti* and then connect defendant with the killing, and though such practice should be adhered to where the questions of the *corpus delicti* are clearly separate from that of the defendant's guilt, the court may in its discretion admit testimony as to the *corpus delicti* and the defendant's guilt at the same time when the two matters are so intimately connected that there can be no separation.

Criminal Law—Testimony as to Acts and Admissions of Defendant Admissible at Any Stage of Proceeding Where Corpus Delicti is Dependent Thereon.

10. Where the *corpus delicti* in homicide prosecution depends entirely for its existence upon the acts and the intent of the accused, such acts and admissions, if admissible at all, are admissible at any stage of the proceeding.

Homicide—"Corpus Delicti" Defined.

11. The *corpus delicti* is the body of the offense or crime, and consists in homicide prosecution of the death and the existence of criminal agency as the cause thereof.

**Homicide—Direct Evidence not Necessary to Establish Corpus Delicti and Defendant's Guilt.**

12. In a homicide prosecution, direct evidence is not required to prove either the *corpus delicti* or defendant's guilt, but circumstantial evidence, where relied upon, must be of the most cogent and convincing nature.

**Criminal Law—Defendant's Confession Alone, Without Corroborating Proof of Corpus Delicti, Insufficient to Support Conviction.**

13. Defendant's confession, taken alone and without corroborating proof of the *corpus delicti*, is not sufficient to support a conviction.

**Criminal Law—Jurors Sole Judges of Credibility of Witnesses and Value of Evidence.**

14. Jurors are the sole judges of the credibility of witnesses and the effect or value of the evidence.

**Homicide—Corpus Delicti Held for Jury.**

15. In homicide prosecution evidence *held* sufficient to establish the *corpus delicti*.

**Homicide—Evidence Held to Sustain Conviction of Murder.**

16. In prosecution for murder, in which it was claimed that defendant killed deceased and burned his body and cabin in which he had resided to prevent deceased from informing authorities that defendant was engaged in moonshining, evidence *held* to sustain conviction.

**Criminal Law — Instruction as to Declaration Accompanying the Crime Held Erroneous, in Absence of Evidence as to Any Such Declaration.**

17. In prosecution for murder in which there was no testimony of any declaration accompanying the act of homicide or so closely connected therewith as to be deemed a part of *res gestae*, court erred in instructing jury as to such declarations.

**Homicide—Evidence as to Note Given Deceased Admissible When Robbery was Motive.**

18. In prosecution for murder, testimony that witness had given deceased a certain note, and that he had made interest payment thereon to deceased shortly before the homicide, *held* admissible, where defendant had possession of the note after the homicide, as possession of valuables by deceased may always be shown where the motive is robbery.

**Homicide—Testimony That Defendant was Seen in Possession of Note Belonging to Deceased Shortly After Homicide Admissible.**

19. In prosecution for murder, testimony that a few days after the homicide defendant was seen in possession of note belonging to

12. For authorities discussing the question of necessity of proof of *corpus delicti* in homicide, see notes in 78 **Am. Dec.** 252; 68 **L. R. A.** 35, 46, 53, 57; 7 **L. R. A. (N. S.)** 181.

13. Proof of *corpus delicti* as essential to admissibility of confession, see note in 1 **Ann. Cas.** 823.

deceased *held* admissible; defendant's unexplained possession being a valuable circumstance tending to establish guilt.

#### Homicide—Testimony That Witnesses Saw Fire in Which Deceased was Burned to Death Held Admissible.

20. In prosecution for murder, in which it was claimed that defendant had set fire to cabin in which deceased lived, in which fire deceased had been burned to death, testimony that witnesses saw fire in vicinity of deceased's cabin during the night of the homicide, and that they saw no other fires during such night, *held* admissible.

#### Homicide—Testimony as to Position of Contents of Cabin Claimed to have Been Set on Fire by Defendant Held Admissible.

21. In prosecution for murder, in which it was claimed that deceased was burned to death in fire set by defendant after defendant had bound deceased, testimony as to contents of cabin and position thereof and as to door being unhung *held* admissible.

#### Homicide—Testimony as to Condition of Building Claimed to have Been Set on Fire by Defendant Held Admissible, Though Remote.

22. In prosecution for murder in which it was claimed that defendant set fire to deceased's cabin, and that deceased was burned to death therein, testimony as to condition of door of cabin at a time preceding the homicide *held* admissible; the objection of remoteness going to the weight, and not to the competency of the testimony.

#### Homicide—Testimony as to Threats Made by Defendant Held Admissible.

23. In prosecution for murder, testimony as to threats made by defendant *held* admissible to show his *animus* toward deceased and as circumstances affecting his guilt or innocence.

#### Homicide—Considerations Affecting Weight to be Given Testimony as to Defendant's Threats Toward Deceased.

24. Weight of evidence as to threats by defendant as showing *animus* and guilt is dependent on their character, the occasion, nearness in time, and the particular circumstances surrounding the offense.

#### Homicide—Defendant's Declaration That He Did It in Self-defense Held Admissible.

25. In prosecution for murder, in which defendant denied having killed deceased, testimony as to defendant's declaration, made while in jail, that "I will show them I done it in self-defense," *held* admissible.

#### Criminal Law—Canceled Check to Deceased in Payment of Interest on Note, Found in Defendant's Possession After Homicide, Held Admissible Over General Objection.

26. In prosecution for murder, in which there was testimony that defendant was in possession of deceased's note shortly after the homicide, canceled check from maker of note to deceased, showing payment of interest shortly before the homicide, but cashed three days after deceased's death, *held* admissible as against general objection.

Witnesses—Defendant's Cross-examination of State's Principal Witness as to Declaration of Witness Showing Hostility Toward Defendant Proper.

27. In murder prosecution, refusal to permit defendant to cross-examine state's principal witness, who had been arrested for moonshining, as to whether he had stated to named person that defendant had "squealed on me, * * and I will make him do time," *held* reversible error; such testimony being admissible to show that witness entertained hostile feelings against defendant.

Criminal Law—Presumed to Speak Truth, but Presumption may be Overcome.

28. A witness is presumed to speak the truth, but this presumption may be overcome.

From Deschutes: T. E. J. DUFFY, Judge.

In Banc.

This is a criminal action prosecuted by the State of Oregon against the defendant, accused by the grand jury of the Circuit Court in and for Deschutes County, State of Oregon, of the crime of murder. The charging part of the indictment reads as follows:

"The said A. J. Weston, on the 24th day of March, A. D. 1919, in the said county of Deschutes and State of Oregon, then and there being, did then and there purposely, maliciously and feloniously kill and murder one Robert H. Krug * * , by means unknown to the grand jury, contrary to the statutes in such cases made and provided."

This indictment was returned into court on November 8, 1920, about twenty months following the alleged homicide.

The case coming on to be heard for the purpose of arraignment, the court informed the defendant that if he had not been indicted under his true name, he must now declare it or be proceeded against in the name under which he was indicted; whereupon, defendant answered that A. J. Weston was his true

name. After his arraignment the defendant demurred, on the following grounds:

"That said indictment does not substantially conform to the requirements of Chapter 7 of Title XVIII of the Code of Criminal Procedure of the State of Oregon.

"That more than one crime is charged, or attempted to be charged, by the said indictment.

"That said indictment does not state facts sufficient to constitute a crime against the laws of the State of Oregon."

This demurrer was overruled.

Thereafter, the defendant entered a plea of not guilty, and, upon trial, was convicted of the crime of murder in the second degree and sentenced by the court to be punished by imprisonment in the penitentiary during the life of the defendant. From that judgment he appeals to this court, assigning error, among other things, as follows:

In overruling the objection of the defendant to the indictment and permitting the state to offer any evidence under it.

In admitting, over objection, evidence as to defendant's confessions prior to the establishment of the *corpus delicti.*

In sustaining the objection of the state to the cross-examination of witness George Stilwell.

In permitting witness Wilson on redirect to give explanations as to why he had told certain parties of the alleged confession of the defendant.

In permitting witness W. S. Fullerton, over objection of defendant, to testify concerning a check marked "State's Exhibit B," and in receiving in evidence said check.

In permitting witnesses George Stilwell and Joe Wilson to testify to a certain note alleged to have been in the possession of the defendant.

In permitting witnesses H. N. Cobb, Lige Sparks, W. E. T. Wilson, Glen Wilson, Charles Gist, George

E. Aitken, Ellis Edgington, John Bruns, T. J. Sanders, E. N. Harrington, Bertha Wilson, Carl Wood and other witnesses to give certain testimony.

In refusing to permit the defendant further to examine John Bruns as a witness.

In refusing to permit witness Nisewonger, the coroner, to testify as to the condition of the body of deceased at the time of the discovery of the remains.

In rejecting certain evidence and restricting cross-examination.

In refusing to strike certain testimony.

In refusing to grant a motion of defendant to instruct the jury to return a verdict of not guilty.

In giving certain instructions, and in refusing certain other instructions.

REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. Allan R. Joy, Mr. N. G. Wallace* and *Mr. E. O. Stadter,* with oral arguments by *Mr. Joy* and *Mr. Wallace.*

For respondent there was a brief over the names of *Mr. W. P. Myers, Mr. H. H. DeArmond* and *Mr. R. S. Hamilton,* with oral arguments by *Mr. Myers* and *Mr. De Armond.*

BROWN, J.—The deceased, Robert H. Krug, met his death on the evening of March 24, 1919. He was a bachelor, sixty-five years of age, and resided alone in his cabin situate about five miles north of the village of Sisters, in Deschutes County, Oregon. His nearest neighbor was Joe Wilson, who owned, operated, and resided at a sawmill located about three quarters of a mile southwesterly from Krug's cabin. Living at the mill and employed by Wilson were the defendant and George Stilwell. Wilson and Stilwell

were the state's chief witnesses on the trial of this case.

About 7:45 o'clock on the evening of March 24, 1919, flames of fire arose in the vicinity of the Krug cabin. Owing to the season of the year, the fire attracted notice from a number of witnesses residing as far distant as the little town of Sisters. However, no person made any investigation at that time. On that night, Wilson was away from his mill, but the defendant and George Stilwell were there. Between 10 and 11 o'clock in the forenoon of the following day, defendant telephoned Mrs. H. N. Cobb, in charge of the telephone exchange at Sisters, and said to her that he started from the mill to Krug's cabin that morning after eggs; that when he got in sight of the place he saw a smouldering fire, and that on closer investigation he was positive the body was in the flames. He further stated that:

"I set my bucket down at the gate and came over to the Tones place here to notify the sheriff."

. In response to defendant's request, Mrs. Cobb called the sheriff of Deschutes County by telephone and advised him of the burning of the cabin and that there was someone burned up in it. The sheriff immediately notified the district attorney and the coroner and the three went to the scene of the fire. When the sheriff arrived at the Krug place, H. N. Cobb was in charge of the premises and a number of others, including the defendant, were present. A coroner's jury was impaneled, an inquest held, the body identified as that of Krug, and, so far as the record before us shows, no offense was charged. Before the coroner's jury had left the premises, Joe Wilson arrived, George Stilwell already being present.

At the conclusion of the inquest, Wilson, Stilwell and defendant Weston returned to the mill. A few weeks later, George Stilwell left the mill and went to Portland, where he has since resided. Weston continued to work for Wilson from time to time until well along in the autumn of 1919, when Wilson's mill was destroyed by fire. Wilson stated that the burning of the mill ruined his future chances of making whiskey where he was working, and that he then got another outfit and went to Crook County, where he manufactured whiskey until he was arrested in February, 1920, taken to Portland and incarcerated in jail.

After the destruction of the mill, Weston resided on his place situate about three and one-half miles east of Sisters and about five miles south and east of the Wilson sawmill. He was arrested in the latter part of September, 1920, and incarcerated in the county jail at Bend, Deschutes County, charged with the killing of Krug.

The theory of the prosecution was that the defendant, A. J. Weston, Joe Wilson, and George Stilwell were engaged in operating a still in the manufacture of whiskey at the sawmill owned by Wilson; that Krug had obtained knowledge of the same; that Weston knew that Krug realized what defendant and his accomplices in crime were doing, and, believing there was danger of Krug's making a complaint to the officers, killed him.

From the time of the death of Krug until about the time of defendant's arrest, Joe Wilson and George Stilwell, the state's leading witnesses, kept their knowledge of the homicide from the officers. If their story is true, the killing of old man Krug constitutes an atrocious homicide.

The defendant challenges the sufficiency of the indictment, first, in that it does not substantially conform to the requirements of Chapter 7, Title XVIII, of the Criminal Code; second, that the act or commission charged as a crime is not set forth in concise language; further, that the act charged as a crime is not stated with such a degree of certainty as to enable the defendant to make a defense.

1, 2. It is a general rule that in an indictment both the Christian name and the surname of the accused should be stated: Joyce on Indictments, § 213; 22 Cyc. 322. The authorities tell us that the common-law rule was that the use of initials instead of the full Christian name of defendant was insufficient, unless the accused had no other name. Our statute provides for the correction of the misnomer upon arraignment.

The record in this case shows that upon his arraignment the defendant answered that his true name was A. J. Weston.

3-5. The indictment charges that the defendant killed deceased by means to the grand jury unknown. The form of indictment follows Form No. 1, page 1346, Or. L. That form is a part of the Code of this state.

"The manner of stating the act constituting the crime as set forth in the appendix in this Code is sufficient in all cases where the forms there given are applicable * * ." Section 1439, Or. L.; *State* v. *Dodson,* 4 Or. 64; *State* v. *Spencer,* 6 Or. 152; *State* v. *Brown,* 7 Or. 186; *State* v. *Lee Yan Yan,* 10 Or. 365; *State* v. *Farnam,* 82 Or. 211, 224 (161 Pac. 417, Ann. Cas. 1918A, 318).

The indictment contains every allegation set forth in Form No. 1 of the appendix.

This court has held in a large number of cases, that when an indictment contains every allegation mentioned in the form given in the appendix to the Criminal Code for the crime charged, it is sufficient under the provisions of the statute: *State* v. *Ah Lee,* 18 Or. 540 (23 Pac. 424); *State* v. *McAllister,* 67 Or. 482 (136 Pac. 354); *State* v. *Hosmer,* 72 Or. 57 (142 Pac. 581); *State* v. *Morris,* 83 Or. 429, 434 (163 Pac. 567). However, in every case where the evidence before the grand jury establishes the manner of slaying the deceased, the indictment should so allege. It is not necessary for the indictment to aver that the person killed was a human being: 1 Michie, Homicide, § 131; *People* v. *McNulty,* 93 Cal. 427 (26 Pac. 597, 29 Pac. 61); *Cremar* v. *People,* 30 Colo. 363 (70 Pac. 415); *Sutherland* v. *State,* 121 Ga. 591 (49 S. E. 781); *Kirkham* v. *People,* 170 Ill. 9 (48 N. E. 465); *Porter* v. *State,* 173 Ind. 694 (91 N. E. 340); *State* v. *Stanley,* 33 Iowa, 526; *People* v. *Gilbert,* 199 N. Y. 10 (92 N. E. 85, 20 Ann. Cas. 769); *Fooshee* v. *State,* 3 Okl. Cr. 666 (108 Pac. 554); *State* v. *Day,* 4 Wash. 104 (29 Pac. 984); *Bowers* v. *State,* 122 Wis. 163 (99 N. W. 447); *Ringo* v. *State,* 54 Tex. Cr. App. 561 (114 S. W. 119). An allegation in an indictment for homicide to the effect that the defendant committed the crime by some means and manner to the grand jury unknown, or by some means, instruments and weapons to the jurors unknown, is sufficient when the circumstances of the case will not admit of greater certainty: *State* v. *Farnam, supra; Newell* v. *State,* 115 Ala. 54 (22 South. 572); *Houston* v. *State,* 50 Fla. 90 (39 South. 468); *Waggoner* v. *State,* 155 Ind. 341 (58 N. E. 190, 80 Am. St. Rep. 237); *Commonwealth* v. *Holmes,* 157 Mass. 233 (32 N. E. 6, 34 Am. St. Rep. 270); *Commonwealth* v. *Webster* (Mass.), 5 Cush. 295 (52

Am. Dec. 711); *State* v. *Brown,* 168 Mo. 449 (68 S. W. 568); *State* v. *Williams,* 52 N. C. 446 (78 Am. Dec. 248); *State* v. *Burke,* 54 N. H. 92; *Harris* v. *State,* 37 Tex. Cr. App. 441 (36 S. W. 88).

The defendant in the instant case was not prejudiced by the inability of the grand jury to state the means by which the life of Krug was taken.

The defendant asserts that the court erred in admitting his alleged confessions as evidence in the trial of the cause before the *corpus delicti* was established. He also asserts that the ruling of the court was erroneous wherein the introduction of certain admissions, declarations and acts of the defendant was permitted before proof of the *corpus delicti,* and, that such declarations, admissions and acts do not constitute competent proof of the *corpus delicti.* He vigorously contends that the state failed to prove the *corpus delicti,* and at the trial moved the court for an order directing the jury to acquit the defendant by returning a verdict of not guilty.

To avoid repetition of the evidence, we will discuss these contentions together.

6. At the beginning, we observe that the defendant confuses the meaning of the words "admission" and "declaration" with that of the term "confession."

In the case of *State* v. *Stevenson,* 98 Or. 291 (193 Pac. 1030), the following definition of "confession" was approved:

"A confession is a voluntary admission or declaration made by a person who has committed a crime to another of the agency or participation which he had in it."

In *State* v. *Rinehart,* 26 Or. 477 (38 Pac. 822), this court said:

102 Or.—8

"A confession in a legal sense is restricted to an acknowledgment of guilt * * and does not apply to a mere statement or declaration of an independent fact from which such guilt may be inferred."

To like effect are *State* v. *Rogoway,* 45 Or. 610 (78 Pac. 987, 81 Pac. 234, 2 Ann. Cas. 431); *State* v. *Brinkley,* 55 Or. 141 (104 Pac. 893, 105 Pac. 708), on motion for rehearing, also additional authorities therein cited.

Admissions, in the law of evidence, have been defined as concessions or voluntary acknowledgments made by a party of the existence of certain facts, and have been said to be direct or express, implied or indirect, or incidental. They are statements by a party or someone identified with him in legal interest, of the existence of a fact which is relevant to the cause of his adversary: 22 C. J. 296, 297.

"The words 'confession' and 'admission' are not synonymous, the latter relating to the acknowledgment of facts, and the former to the acknowledgment of guilt." *State* v. *Heidenreich,* 29 Or. 381 (45 Pac. 755).

Our Code provides as follows:

"Evidence of facts which may be given on the trial: (1) The precise facts in dispute; (2) the declaration, act or omission of a party as evidence against such party." Or. L., § 727, subd. 1

Section 1537, Or. L., relates to that class of declarations and admissions whereby a person accused of crime acknowledges that he committed it, or that he is an accomplice therein. Such a declaration is denominated a confession. Said section reads:

"A confession of a defendant, whether in the course of judicial proceedings or to a private person, cannot be given in evidence against him, when made under the influence of fear produced by threats; nor is a

confession only sufficient to warrant his conviction, without some other proof that the crime has been committed.''

It was held in *State* v. *Brinkley, supra,* that:

''Statements of extraneous facts by accused not involving guilt even when his confession is inadmissible because not voluntary, or for any other reason, may be received against him as evidence of such fact and may be sufficient to prove the *corpus delicti.''* Par. 7, Syllabus.

7. The declarations and admissions made by the defendant and received in evidence over the defendant's objection are hereinafter set out. That evidence was competent, independent of the confession, and, if believed, afforded some proof of the *corpus delicti,* because it tended to show the criminal agency of the defendant: *State* v. *Rogoway, supra; State* v. *Brinkley, supra.*

8–10. We will now turn to the contention that the alleged extrajudicial confession made by the defendant to Joe Wilson and George Stilwell was offered and admitted in evidence before proof of the *corpus delicti* had been made. In discussing this objection, it should be kept in mind that the order of proof is regulated by the sound discretion of the court: Or. L., § 853; *State* v. *Isenhart,* 32 Or. 173 (52 Pac. 569); *State* v. *Remington,* 50 Or. 99 (91 Pac. 473). On the trial of homicide cases, it is the general practice first to establish the *corpus delicti,* which is done by proving the death and identifying the body as that of the person alleged to have been slain, and showing the criminal agency causing such death. The defendant may then be identified and the crime brought home to him and the other essential elements of the crime proved. But, as provided by our Code, the

order of such proof is largely in the discretion of the
trial court: Elliott on Evidence, § 3023; 7 R. C. L.,
p. 778.   It was held by the court in *State* v. *Alcorn,*
7 Idaho, 599 (64 Pac. 1014, 97 Am. St. Rep. 252),
that while the evidence must be sufficient to prove the
*corpus delicti* before a verdict of guilty can be sus-
tained, such evidence may be put in after the com-
mission of the crime by the defendant and his in-
tentions are proved.   The *corpus delicti* and the
criminal agency are so often involved that testimony
on both issues is admitted at the same time: *Gay* v.
*State,* 42 Tex. Cr. Rep. 450 (60 S. W. 771).   In *Floyd*
v. *State,* 82 Ala. 16 (2 South. 683), the court held
that on the trial of an indictment for murder, if the
evidence of the confessions of the defendant is ad-
mitted before proof of the *corpus delicti,* the evidence
of such confessions will be rendered admissible by
subsequently showing the *corpus delicti* and the error
be thereby cured.   To similar effect is *Holland* v.
*State,* 39 Fla. 178 (22 South. 298).   In *People* v.
*Swetland,* 77 Mich. 53 (43 N. W. 779), the court held
that where the body of the offense is so intimately
connected with the question of whether or not the
accused is guilty of the crime that there can be no
separation, and the *corpus delicti* depends entirely
for its existence upon the acts and the intent of the
accused, such acts and admissions, if admissible at all,
are admissible at any stage of the proceedings upon
the trial.

The general rule that confessions are not admissible
until after proof of the *corpus delicti* should prevail
where the question of the *corpus delicti* is clearly
separate and distinct from that of the guilt of the de-
fendant: 1 Wharton's Criminal Evidence, § 325f.

"But, in many cases, the two matters are so intimately connected that the proof of the *corpus delicti* and the guilty agency is shown at the same time; hence, the order of proof in a criminal case is generally within the discretion of the trial court, and this prevails so generally that error committed in admitting testimony as to the guilt before the proof of the *corpus delicti,* is cured where the subsequent testimony establishes the *corpus delicti.*" 1 Wharton, *supra,* and collection of authorities under notes 5, 6 and 7.

From an inspection of the record, we are convinced that the discretion vested in the court by law, relating to the regulation of the order of proof, was not abused.

11. The prosecution asserts that the *corpus delicti* was proved by sufficient evidence prior to the admission of the alleged confessions made by the defendant. The defendant denies this assertion and avers that the *corpus delicti* was not proved. Counsel, like many of the courts, are not in harmony when defining the term "*corpus delicti.*" By "*corpus delicti*" is meant the body of the offense or crime. Black's Dictionary of Law says:

"The *Corpus delicti:* The body of a crime; the body (material substance) upon which a crime has been committed; e. g., the corpse of a murdered man, the charred remains of a house burned down. In a derivative sense, the substance or foundation of a crime; the substantial fact that a crime has been committed."

The *corpus delicti* consists of two fundamental facts: First, the death, and, second, the existence of criminal agency as the cause thereof.

" 'The *corpus delicti* is made up * * ,' says Mr. Best, 'of two things; first, certain facts forming the basis; and secondly, the existence of criminal agency

as the cause of them.' "  *State* v. *Rogoway,* 45 Or.
601 (78 Pac. 987, 989, 2 Ann. Cas. 431).

It has often been stated that in murder the *corpus
delicti* has two components; death as the result, and
the criminal agency of another as the means.

"The finding of a dead body establishes only the
*corpus.* The finding of such body under circum-
stances that indicate a crime would indicate the
*delicti,* or felonious killing. When these facts con-
cur, the first element of the *corpus delicti,* the crimi-
nal act, is made to appear. Hence, it is not necessary
to the establishment of a complete *corpus delicti* that
identity should be shown, because the dead body and
the crime against it complete all that is indicated by
the *corpus delicti.*" 1 Wharton's Crim. Ev., § 325.

We take the following from note 4, 1 Wharton,
*supra*:

"The idea conveyed by the phrase '*corpus delicti*'
is not obscure. While it is generally defined as the
body of a crime, it is more clearly expressed by call-
ing it the body or thing which is the victim of a
wrong. The body of a man produced under circum-
stances that show a felony is *corpus delicti* in homi-
cide, but the expression is equally correct applied to
all crimes. The bodies of sheep or other domestic
animals, with indications of poison feloniously ad-
ministered, is *corpus delicti* in malicious mischief. A
house partly burned, with evidence of incendiary fire,
is *corpus delicti* in arson. The primary fact is the
*corpus delicti.* When that appears in any crime,
then follows the investigation which has for its ob-
ject the detection and punishment of the criminal
agency."

In *State of Iowa* v. *Millmeier,* 102 Iowa, 692–698
(72 N. W. 275, 277), the court said:

"Counsel do not agree as to what constitutes *corpus
delicti,* and we find that courts are as far apart as

counsel in defining the term. The expression means, primarily, the body of the offense. But in applying it, courts and text-writers have not at all times agreed as to what is meant by the 'body of the offense.' In our opinion, the term means, when applied to any particular offense, that the particular crime charged has actually been committed by someone. It is made up of two elements: first, that a certain result has been produced, as that a man has died, * * ; second, that someone is criminally responsible for the result: *Ruloff* v. *People,* 18 N. Y. 179; *People* v. *Bennett,* 49 N. Y. 137; *Winslow* v. *State,* 76 Ala. 42; *Pitts* v. *State,* 43 Miss. 472; *People* v. *Palmer,* 109 N. Y. 113 (16 N. E. 529).''

Now, as to the sufficiency of the evidence to prove the death of Krug as the result, and the criminal agency of another as the means:

In discussing the sufficiency of evidence to establish the *corpus delicti* in a criminal cause such as the case at bar, the courts have frequently and very correctly stated that no universal and unvariable rule can be laid down as to what will amount to proof of the *corpus delicti,* as each case depends upon its own peculiar circumstances. We quote the following:

''No universal and unvariable rule can be laid down in regard to the proof of the *corpus delicti.* Each case depends upon its own peculiar circumstances. The body of the crime may be proved by the best evidence which is capable of being adduced, if it is sufficient for the purpose. Such an amount of accompanying or relative facts, whether direct or circumstantial, must be produced as establish the fact beyond a moral certainty, and to the exclusion of every other reasonable hypothesis.'' *State* v. *Williams,* 46 Or. 287, 297 (80 Pac. 655).

12, 13. In this state, direct evidence to establish either of these elements is not required, but where

circumstantial evidence is relied upon it must be of the most cogent and convincing nature. It is the settled law of Oregon that the *corpus delicti* taken as a whole may be shown by any evidence which satisfies the jury beyond a reasonable doubt, whether it be direct or indirect. But this is qualified and limited by the rule that the defendant's confession taken alone, and without corroborating proof of the *corpus delicti,* is not sufficient to support a conviction: *State* v. *Williams, supra; State* v. *Barnes,* 47 Or. 592 (85 Pac. 998, 7 L. R. A. (N. S.) 181); Kerr on Homicide, p. 540, and the numerous authorities there cited under notes 2 and 3.

There are many examples of cases that illustrate the rule that the evidence required to prove the *corpus delicti* in a case of homicide, depends upon the facts peculiar to the given case. The reports afford instances of homicide where the victims have been killed and their bodies destroyed by chemicals, fire or other agencies, thus concealing not only the identity of the deceased, but the manner and means of procurement of death as well. The trial of such a case cannot be bound by an inflexible rule relating to the proof of the *corpus delicti.* The case at bar depends upon its own peculiar facts and, so long as the *corpus delicti* is proved by clear, unequivocal, cogent and convincing evidence, the law is satisfied.

14. Keeping in mind the principles of law referred to, and, further, that the jury are the sole judges of the credibility of the witnesses and of the effect or value of the evidence adduced upon the trial of this cause, we will set down a synopsis of the testimony for the purpose of determining whether the verdict is based upon evidence, or, whether there was a failure of proof as contended by defendant.

H. N. Cobb testified that his wife instructed him to go to the scene of the Krug fire; that when he reached the place "there wasn't very much left, only just a smoldering fire and the body lying there." He said:

"The fire was burning around the body. He was lying on his back and the feet up to his knees partly burned off. The hands and arms were burned off. When I first went there I believe the head was on.

"Q. How was it later?

"A. Well, it fell into ashes. The fire kind of fell down and it went in the ashes."

He testified that defendant came to the scene of the fire and, while there, said to witness, that:

"He came down there after eggs and the house was burned and he left his bucket; and he said he was down Sunday night and he [Krug] was all right Sunday night."

We have previously shown the statement made by defendant to Mrs. Cobb when requesting her, as telephone operator, to notify the sheriff.

E. N. Harrington, George E. Aitken, Bertha Wilson and Carl Wood testified to their observation of a fire on the evening of the 24th of March at about the hour of 7:45 o'clock, which fire was in the immediate vicinity of Krug's cabin.

S. E. Roberts, sheriff, testified to the fact of his being called to the Krug place after the fire; that he started to walk out to investigate and had gone about thirty yards with the idea of making a complete circle of the Krug house, when he saw some fresh tracks.

"I stopped and was looking at these tracks, and about that time Jack Weston says: 'Say, Sheriff, those are my tracks where I came over this morning

to get some eggs. Here is my pail I set down, I was going to get the eggs in.' ''

Relating to the body, witness said:

"It was pretty badly burned. The arms and legs were burned off and the head was gone. The body was twelve or fourteen feet from the fireplace. Some portion of clothes was on the body on the back, some little clothing between the legs."

He further testified that:

"After he [defendant] called my attention to the fact of those tracks here, I watched him. I thought he was watching me pretty close."

George Stilwell testified that at the time of the trial he was a resident of Portland, but had resided in Central Oregon for eighteen years; that he was at the Krug cabin after the fire; that in March, 1919, he lived at Joe Wilson's sawmill for three or four weeks.

"Krug used to come over to the mill once in a while and talk to us. * * One particular time he come through there and we were making whiskey. So he come up and caught us making whiskey. * * Weston was there. He came through another time and Mr. Weston thought he caught us moonshining. * *

"Q. What did Weston do or say at that time?

"A. He said: 'We got to work some way of getting rid of Mr. Krug on account he caught us moonshining. If we don't get him he will get us.'

"Krug had come up and asked me if I was washing. When he first came there he asked me what I was doing, and I said I was washing. The next time he said: 'I see you are still washing.' I said: 'Yes.' After he went away Weston said: 'He caught us moonshining.' So he wanted me to go over and help kill him. * * He said Krug must have lots of money. He said: 'We just as well get the money because he caught us. If we didn't get him—' he said, 'while we are getting him we just as well get the money.'

"On the evening of the 24th he [Weston] left some-where about dark and he came back some time in the night, but I was asleep and couldn't say what time it was. * * Next morning I started a fire in the cook stove. Fifteen minutes or half an hour after, Mr. Weston came down. I smelled fumes of flesh burn-ing * * , thought it was cattle. I drawed his atten-tion * * . He said: 'It must be Krug's; it is com-ing from that direction.' The smoke was very small. It was from the northeast direction. He said: 'It must be Krug.' After breakfast, he took the little bucket and said: 'I will go over and get eggs.' He was gone half an hour. Came back and said Krug's house had burned down, 'and it looks as though he had burned up in it.' He said: 'I will notify the sheriff.' "

Joe Wilson testified that he had lived near Sisters for eighteen or twenty years, and that he was engaged in the sawmill business; that he had been acquainted with Weston ten or eleven years, likewise, that he had known Robert H. Krug, deceased, for twenty-five or thirty years; that in 1918, witness had built an addition to Krug's old log house, consisting of a lean-to, and had reshingled and refloored the cabin; that he was not at home on the 24th of March, but returned on the 25th, arriving at the Krug place about 2 o'clock in the afternoon, where he saw the ruins of the cabin and the body of a human being that in his best judgment was Krug's body. He fur-ther testified to a declaration made by defendant, as follows:

"On our way home to the mill from the Krug cabin on the day of the inquest, defendant said to me: 'Mum's the word.' I said, 'It is all up with us now, Jack.' He said: 'It is all off, anyway.' He said: 'Krug caught us making whiskey. There had to be something done.' "

Lige Sparks testified that within a few days prior to the burning of the Krug house,—

"He [defendant] came there [Cloverdale] and got his pistol and dog and took them away. He said: 'Boys, I am going to keep him off that land and make that whiskey if I have to go to the penitentiary for life.'"

Cross-examination by Mr. Wallace:

"Q. What was it he said?

"A. He come and got his pistol and his dog and took them with him and said he was going to keep Krug off that land and make that whiskey if he went to the penitentiary for life."

W. T. E. Wilson testified as follows, concerning a declaration made by the defendant:

"Mr. Weston came down to my house and stayed all night and in the morning after breakfast he spoke about running his business up at the sawmill close to Mr. Krug's. Well, he said he could not do anything up there in that business in the line of moonshining on account of Mr. Krug came over there every day or two nosing around and interfered with the business. He said: 'When I go back, I will stop him from coming to that mill.'"

Witness further testified that the defendant took his pistol away with him.

W. S. Fullerton testified that about the 18th day of February, 1918, he made, executed and delivered to Robert H. Krug his promissory note for the sum of three hundred dollars, and that on March 18, 1919, he paid the interest then due on the note, by a check in the sum of $16.60. Within a very few days following the death of Krug, a note answering the description of the Fullerton note was seen by Stilwell and by Wilson in the personal possession of the defendant. Stilwell swore that defendant exhibited to him the

note and said: "Here is a note the Krug estate will never get, unless it is recorded."

T. J. Sanders testified that the defendant said to him the day he was put in jail:

"They have got me in wrong, on the wrong side of the bars; but I will show them I done it in self-defense."

The death of Krug seems to have been proved. The associations, habits, occupation, the place of finding the body, and the life history of Robert H. Krug, together with the many circumstances surrounding the destruction of his home, all tend towards establishing the charred body found in the ruins of his cabin as that of Krug, and of no one else. In fact the defendant, in his brief, admits that the body found in that cabin was Krug's body. For that reason, we have omitted much of the testimony relating to the identification of the body.

We will now quote excerpts from the testimony of defendant's confession, made to his two accomplices in the manufacture of intoxicating liquor.

George Stilwell said:

"After the coroner's inquest, we were sitting on the bench, and he said: 'I went over last night and took a club and knocked Krug in the head * * . Then I tied him up with a rope and tied a rope around his neck and choked him to get his money. The old fellow was so stingy he would not give it. I still believe he has money buried there, but he would rather die than give it up to us. I took his shoes off and stuck his feet in the fire to torture him, to get his money.' * *

"We were working at the mill the day the cabin burned; working with the tubs, getting ready for moonshining."

About the first of April witness left Wilson's sawmill and went to work for Brook-Scanlon, and was employed there until the fifteenth day of December, when he went to Portland. He testified that his memory is not good.

"Q. Who have you talked to about what your testimony would be?

"A. Bill Wilson.

"Q. Did you make a statement to him similar to what you have stated here to-day?

"A. Not exactly; no sir. I told him about Krug coming over there. I don't know just exactly the words I said to him. The talk was a few days after Krug's house burned. * *

"Mrs. Combs (now Mrs. Weston) asked me: 'Do you think it would be possible Jack done that?' I said: 'I don't know if he could or not. I don't see how he could. He stayed with me last night.' I didn't intend at that time to tell anybody he did or didn't do it. I didn't explain it."

Joe Wilson's version of the confession by defendant is as follows:

"On Sunday he [Weston] followed him [Krug] down to Sisters and walked through Sisters to see if he made any report down there in regard to catching them making whiskey. He said that on Monday he went over to Mr. Krug's house and stayed there most of the day with him; stayed there until it was too late in the day for Mr. Krug to go away anywhere. Then he went back to the mill and got his supper. He went back over again in the evening. Krug * * was eating his supper. He came out of the kitchen on to the porch. Weston stood by the door and as he came in hit him with a stick * * and knocked him down. He had a flour sack that he had made up into a dish cloth or tea towel * * . He had that with him and gagged him with the tea towel. Then he took a rope and tied his hands and feet—he didn't say how, and drawed on it. He just said he

tightened up on him this way [illustrating]; that he held him that way and when he released him he told him he [Krug] had caught him making whiskey and he would have to get out of the country and give him $500 to leave the country on. Mr. Krug said to him: 'I thought you were my friend.' He would not give up any money, and Weston tightened on him the second time and also took his shoes off and burned his feet and tried to make him give up the money. * * Krug said to him not to hurt his crippled knee, that he had rheumatism in his knee. While he [Weston] was talking, I said: 'I suppose he did some manful begging.' He answered: 'No. He said: "If you want to kill me, kill me quick." ' Krug told him if he would go and get a little box there, he would find what money he had. Weston went there and got $16. He took the money. * * He had it in a tomato can on a table. * *

"He said when Krug would not give the money up after he had released him a second time, he just drawed on it and in a few minutes it was all over, and he set fire to it. He used magazines and papers under the bed. Said he set them all on fire and went out and sat under a tree until the building fell in and the ammunition was going off, quite a number of cartridges exploded * * .

"I said I would always believe that Krug had money there, and Weston said: 'If he did, he would rather go the route than give it up.' "

On cross-examination, Wilson said:

"Q. Didn't you say to Bill Young: 'Krug burned himself up?'

"A. Likely I did, if we were talking about it, because I was not telling people what I knew about it, at that time."

Witness said:

"I told the sheriff this fall, before the arrest, for the first time. I didn't want to get this into the hands of the officers, because I was making whiskey,

and I could not very well get this in the hands of the officers without exposing myself. When the mill burned down, it ruined my chances of making whiskey. Then I got another outfit and went to Crook County and went to making whiskey. I was arrested in February.''

Again he said:

''I didn't want to tell at that time what we were doing. * * The moonshining was not exposed yet. I didn't want to tell what we were doing.''

15. We are compelled to find against the contention of the defendant that the evidence is insufficient to prove the *corpus delicti.* Hence, the court did not err in overruling defendant's motion for a directed verdict of not guilty.

16. By the evidence adduced upon the trial, the state made out such a case that the duty of submitting it to the jury was imposed upon the court. The truthfulness of the witnesses and the consideration to be given their testimony was for the jury, not for the court, to determine. The testimony admitted at the trial, if believed by the triers of fact, authorized them to return a verdict of guilty.

17. The court instructed the jury that:

''Declarations accompanying the act, or so closely connected therewith, in time, as to be free from all suspicion of device or afterthought, are admissible in evidence as part of the *res gestae* and subject to be charged and weighed by the jury under the same rules which I have given you for weighing and considering other evidence in the case; that is, the connection of the defendant with the case, his interest in it, if any, whether such declarations are consistent throughout or are conflicting with themselves or other facts.''

To the giving of that instruction the defendant reserved an exception. The instruction correctly states a sound principle of law, but it is not applicable to the facts in this case. There is no testimony in the record showing any declaration accompanying the act of homicide, or so closely connected therewith as to be deemed a part of the *res gestae.* The giving of this instruction was error: *State* v. *Branson,* 82 Or. 377 (161 Pac. 689).

"To render declarations made by a party after the commission of an act which is the subject of inquiry admissible in evidence as a part of the *res gestae,* they must have grown out of, and be so intimately connected and contemporaneous with, such act as to illustrate its character, affording a mirror which involuntarily reflects the cause, motive or effect of the particular action: *State* v. *Glass,* 5 Or. 73; *State* v. *Anderson,* 10 Or. 448; *State* v. *Ching Ling,* 16 Or. 419 (18 Pac. 844); *State* v. *Henderson,* 24 Or. 100 (32 Pac. 1030); *State* v. *Brown,* 28 Or. 147 (41 Pac. 1042); *State* v. *Sargent,* 32 Or. 110 (49 Pac. 889); *State* v. *Smith,* 43 Or. 110 (71 Pac. 973).

18. Defendant assigns error of the court in permitting W. S. Fullerton, called on behalf of the state, to give testimony, over the objection of the defendant, concerning a certain note, and in refusing to strike the evidence relating to the same upon motion. The testimony of Fullerton relative to the execution and delivery by him of a promissory note to Krug and to his payment to Krug of interest thereon on March 22, 1919, is relevant. Whenever a motive for slaying another is robbery, the possession of valuables by the deceased may always be shown. In the instant case, the note, when traced to defendant's possession, was also admissible in evidence as affording some

102 Or.—9

evidence towards the identity of the accused as the slayer of Krug.

19. The court ruled properly in admitting the testimony of witnesses Joe Wilson and George Stilwell, who testified that within a very few days following the 24th of March, 1919, they saw the Fullerton note in possession of the defendant, the same being a note for the sum of $300, executed and delivered to Krug by Fullerton in February, 1918. The recent, personal, exclusive, unexplained possession of that promissory note by the defendant was a valuable circumstance tending to establish the charge against him.

There was no error in permitting Charles Gist, called by the state, to testify concerning the statement made by defendant on Saturday before the fire; nor did the court err in permitting George E. Aitken to testify over objection of defendant that he saw deceased in Sisters on one day and that he saw the defendant there the day following.

20. The testimony of Bertha Wilson, Carl Wood, Glen Wilson, George E. Aitken and E. N. Harrington, relating to the fire which they saw on the fatal night in the vicinity of the Krug cabin, was competent and relevant, as was their testimony that they saw no fires other than that particular fire.

21, 22. A number of witnesses gave testimony as to the condition of the house, with reference to the fact that the door was unhung, the position of the bed and table, and as to the facts generally concerning the cabin and its contents, all of which was admissible. Some of the testimony in reference to the hanging of the door is remote from the 24th of March, 1919, yet the objection goes to its weight, not to its competency.

23, 24. The testimony of Lige Sparks and W. T. E. Wilson is not subject to the objection of defendant, because threats made by defendant are always admissible to show his *animus* toward deceased and as a circumstance affecting his guilt or innocence of the particular crime charged, their weight being dependent greatly on their character, the occasion, nearness in time, and the particular circumstances surrounding the offense: 1 Michie, § 167, p. 754.

25. Error is assigned because T. J. Sanders, janitor of the courthouse, and jailer, was allowed to testify, over objection, that defendant, after his incarceration, said to witness:

"They have got me in wrong, on the wrong side of the bars, but I will show them I done it in self-defense."

This objection can afford the defendant no comfort. The testimony was admissible. The objection goes to its weight. Had the state exercised its right to establish the fact, if it be a fact, that the defendant was informed at or about the time he was incarcerated in jail, and prior to his statement above set out, that he was arrested and jailed for the killing of Krug, then such evidence would be of greater value as a circumstance tending to prove guilt.

26. Error is assigned by reason of the court's ruling, wherein a check from Fullerton to Krug was admitted as evidence. It was permissible to corroborate Fullerton's evidence of payment of interest on his note by introducing the canceled check. The collection of the interest on this negotiable promissory note by Krug was some evidence that he owned and possessed it two days later, when he met his death. It will be remembered that according to Wilson and

Stilwell, the note appeared soon .after Krug's death, in the possession of defendant, and that fact was urged as a circumstance pointing towards his guilt. That check, showing Krug's indorsement, was cashed three days after his death. Krug may have paid a debt with the check, as did Fullerton, or he may have purchased merchandise. If he transferred the check for money, it was within the power of the state to prove that fact, and it should have done so. The defendant's objection is too broad, for it would strike the check from the record for all purposes. Therefore, his assignment must fail.

Upon its own motion, the court could have instructed the jury that the check did not, in itself, corroborate the defendant's confession as related by Wilson and Stilwell, in the matter of the $16 they say he obtained from Krug; and, had defendant so requested, this instruction should have been given.

27, 28. Error is assigned because of the action of the court in sustaining an objection made by the state to a question put to Joe Wilson on his cross-examination by the defendant.

"Q. Now, did you not make a statement to J. E. Warner, known as Gabe Warner, on or about the first day of February, 1920, in the jail at Portland, Oregon, being present yourself and the said J. E. Warner, as follows: 'Jack Weston squealed on me and got me in here to do time, and I will make him do time, the s—— of-a-b——'; and also: 'It seemed to me that Krug burned himself,' or words to that effect.''

The object of this inquiry was to impair the force of the testimony of the witness by showing that he entertained hostile feelings against Weston. That such testimony is admissible, see *State* v. *Welch*, 33

Or. pp. 33, 37 (54 Pac. 213).  How can a jury intelligently weigh the testimony of any witness, unless they knew his credibility?  A witness is presumed to speak the truth, but this presumption may be overcome.

"Such inquiry necessarily involves a consideration of relations he sustains towards, or the feelings of friendship he entertains for, the party in whose favor, or the enmity and wrath he nurses towards the party against whom, he testifies.  All matters which tend in any manner to show the condition of his mind towards the party who may be benefited or injured by his testimony, are proper subjects of investigation and may be proved by competent evidence, either by the cross-examination of witness himself, or by other witnesses who may be called to testify concerning such fact."  *State* v. *Welch, supra.*

To like effect, see *State* v. *Bacon,* 13 Or. 143 (9 Pac. 393, 57 Am. Rep. 8); *State* v. *Ellsworth,* 30 Or. 145 (47 Pac. 199); *Sayres* v. *Allen,* 25 Or. 211 (35 Pac. 254).

It is said in *State* v. *Mah Jim,* 13 Or. 235 (10 Pac. 306), that:

"In a criminal case, any question which tends to show a feeling or bias of the witness against the accused is competent."

In *State* v. *Olds,* 18 Or. 440, 442 (22 Pac. 940, 941), it is said:

"The state had the right, on the cross-examination, to ask this witness anything that would show his interest in the result of the trial."

As provided by Section 704, Or. L., the presumption that a witness speaks the truth may be overcome by evidence affecting his motives.

*State* v. *Mackey,* 12 Or. 154, 156 (6 Pac. 648), says:

"The ends of justice are best attained by allowing a free and ample scope for scrutinizing evidence and estimating its real value."

In *State* v. *Bacon, supra,* it is stated:

"There is no doubt that the state of feelings and relationship of a witness towards the party for or against whom he testifies may properly be shown, to be weighed with his testimony."

And the court quotes with approval the following from 1 Greenleaf on Evidence, Section 446, page 146:

"The situation of the witness with respect to the parties and the subject of the litigation, his intent, his motives, his inclination and prejudices * * are all fully investigated and ascertained and submitted to the consideration of the jury before whom he has testified, and who have thus had an opportunity of observing his demeanor and of determining the just weight and value of his testimony."

The extent of the cross-examination of witnesses rests largely in the discretion of the court. But, as stated in *Sayres* v. *Allen, supra:*

"As the defendant had the right on cross-examination to require that Sayres should give a detail of the circumstances surrounding the facts to which he had testified, prejudice will be presumed where this right is denied."

The record discloses a tendency, in a number of instances, to restrain the cross-examination of the witnesses Stilwell and Wilson. In sustaining the state's objection to a question upon cross-examination, so relevant as the inquiry put to Joe Wilson by the defendant's counsel, a substantial injury has been done defendant, and that wrong affirmatively appears of record. The defendant cannot lawfully be deprived of his valuable right to cross-examine upon

relevant matters, and the hostile feeling, if any, entertained against the defendant, in a case so grave, by the leading witness for the prosecution, is always relevant. His testimony, if believed, shows that they, Wilson, Stilwell and Weston, were accomplices in crime; that Krug discovered them in the criminal act of making whiskey; that the defendant proposed, for their protection, the killing of Krug, also suggested to Stilwell that they rob him,—that he had money; that on March 24, 1919, at about 7:45 o'clock, the Krug cabin was burned, and on the following day the lifeless, headless body of the old man was removed from the ashes of his cabin. The defendant and the two witnesses were at the coroner's inquest. As they went their way from the ruins of the Krug cabin to the Wilson mill, the defendant said to Wilson: "Mum's the word." Wilson's only answer was: "It's all off with us now, Jack." As these three friends were preparing their evening meal, the defendant proceeded to tell his pitiless tale of the robbery and murder of their neighbor and of Wilson's friend of twenty-five or thirty years' standing. When the defendant's recital reached the point of torture in his attempt to obtain money from his alleged victim, Wilson coolly observed: "I suppose he [Krug] did some manful begging." Defendant's story went on and on and pictured Krug's refusal to give up his money, when Wilson remarked: "I will always believe that Krug had money there."

For a year and a half, these two witnesses kept their knowledge of Weston's awful deed from the officers of the law. For as long a time, by their silence they aided the defendant in concealing his crime. Only an overt act upon their part stands in the way

of constituting them accessories after the fact as defined by our Code.

Under the condition that confronted the court, there was but one course to follow, and that was to allow a full and complete cross-examination of these witnesses upon all relevant matters. No worthy man could keep silent for a year and a half under circumstances as disclosed from the witness-stand by Joe Wilson and George Stilwell. To deny the right to cross-examination under the existing conditions, was an abuse of the discretion vested in the court by law. "Guilty men may have escaped punishment altogether; others may have been punished too lightly for their crimes; others may have unreasonably delayed their punishment"; but none of these conditions, nor all of them together, can excuse the court in denying to a human being upon trial for his life or for his liberty, the right that the law of the sovereign State of Oregon gives him, the right to a fair and impartial trial. In weighing the testimony of the witnesses, the jury are entitled to know the hostile feelings, if any, that the witnesses entertain for the defendant, in order to consider what motives may have actuated such witnesses to shade, color, or to give false testimony. Any lawyer of trial experience should know that the denial of the right to cross-examination on all relevant matters is a refusal of a fair trial.

For this error of the trial court, this case must be reversed, and remanded for further proceedings as provided by law.          REVERSED AND REMANDED.